[No. A114623. First Dist., Div. One. Nov. 20, 2007.]

COLD CREEK COMPOST, INC., et al., Plaintiffs and Appellants, v. STATE FARM FIRE AND CASUALTY COMPANY, Defendant and Respondent.

1470

## COUNSEL

Cannata, Ching & O'Toole, Therese Y. Cannata, Michael M. Ching and Maria C. Weydemuller for Plaintiffs and Appellants.

Amy Bach; Anderson Kill & Olick, Paul Walker-Bright and Evan T. Knott for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Appellants.

Chapman, Popik & White and Mark A. White for Defendant and Respondent.

## OPINION

**MARCHIANO, P. J.**—Plaintiffs Cold Creek Compost, Inc., et al. (hereafter, collectively, Cold Creek) appeal from the judgment entered in favor of defendant State Farm Fire and Casualty Company (State Farm) after State Farm's motion for summary judgment was granted in an insurance coverage dispute. The primary issue presented is whether the pollution exclusion in the policies bars coverage for liability for offensive and injurious odors emanating from a compost facility and spreading over a mile away. We conclude that the exclusion applies and affirm the judgment for State Farm.

---

## I. BACKGROUND

Cold Creek operates a facility in Mendocino County that composts organic materials including animal waste (manure), grape pomace, and yard trimmings. Cold Creek was insured by State Farm during the relevant period under a business policy and a commercial liability umbrella policy.

In 1995, people living within two miles of the facility, acting individually and as members of an association called "Preserve Country Neighborhoods" (PCN) filed a petition for writ of mandate and complaint for injunctive relief (*Preserve I*) to require the County of Mendocino to void the use permit it issued allowing Cold Creek to expand its operations, and to prepare an environmental impact report (EIR). The *Preserve I* plaintiffs did not seek damages, but alleged, inter alia, that an EIR was required to address the project's potential environmental effects in areas such as odors, dust, noise, erosion, and earth movement. The *Preserve I* court declined to enjoin Cold Creek's operations, but required preparation of an EIR with respect to the permit. The EIR was certified by the county in April 1998.

In June 1998, PCN and individuals owning or residing in properties in the vicinity of the facility filed a mandate petition and nuisance complaint against Cold Creek (*Preserve II*). The petition for writ of mandate challenged the EIR and the use permit; the nuisance complaint sought damages and injunctive relief.

The nuisance cause of action alleged that Cold Creek had imported and stored on its property "huge quantities of animal and poultry wastes, soiled animal stall bedding, weed ash and other forest product wastes which often contain poisonous chemicals, grape pomace, plant trimmings and/or other agricultural waste materials," and that the composting operations caused "foul and noxious odors, disruptive noise, polluting discharge of materials, excessive dust and truck traffic, and visual blight." Plaintiffs said they had "complained of ongoing severe offensive odors from the composting operations and . . . excessive noise and traffic dangers from trucks loaded with waste coming to and from the . . . site," and had "expressed ongoing concerns about leachate contamination of area groundwater and surface waters and health impacts of Aspergillus and other airborne pathogens from the compost piles." Plaintiffs sought to enjoin Cold Creek from interfering with the use and enjoyment of their properties by allowing "foul odors, disruptive noises, excessive dust, airborne pathogens, truck or heavy equipment traffic, bright reflected or direct glare from roofing materials, and/or ground or surface water pollution to emanate or escape" from the facility.

The mandate petition in *Preserve II* was severed from the nuisance claim and tried first to the court. The court filed its order denying the petition in October 2000.

In August or September 2000, while the court had the petition under submission, Cold Creek tendered its claim for defense and indemnification in *Preserve II*. In October 2000, State Farm advised Cold Creek that it would provide a defense in *Preserve II* under a reservation of rights. Cold Creek asked State Farm to consider reimbursing the attorneys' fees and costs it had incurred in *Preserve I*, and State Farm obtained an opinion of independent coverage counsel in June 2001 as to its obligations with respect to *Preserve I* and *Preserve II*. Counsel opined that there was no coverage in *Preserve I* because no damages were sought in that case. For the same reason, counsel found no potential for coverage of the mandate portion of *Preserve II*. As for the nuisance cause of action, counsel thought that the pollution exclusion in the policies would apply to "most, if not all of the plaintiffs' allegations."

This exclusion, identical in both policies, provides in part:

"[T]his insurance does not apply: [¶] . . . [¶]

"6. to any:

"a. bodily injury, property damage, personal injury or advertising injury arising out of the actual, alleged or threatened discharge, seepage, migration, dispersal, spill, release or escape of pollutants:

"(1) at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

"(2) at or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

"(3) which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

"(4) at or from any premises, site or location on which any insured or any contractor or subcontractor working directly or indirectly on behalf of any insured is performing operations;

"(a) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or

"(b) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of pollutants;

"b. loss, cost or expense arising out of any:

"(1) request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of pollutants . . . ." (Boldface omitted.)

"[P]ollutants" are defined in the policies to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed."

Coverage counsel "believe[d] that the exclusion would apply to the plaintiffs' allegations of damage resulting from leachate and bacterial contamination and foul and noxious odors. It is probable that the exclusion would apply as well to the allegations regarding the migration of dust from the insured's operations—dust is a solid and fairly characterized in this context as an 'irritant.' On the other hand, plaintiffs have referred to other conditions of concern, including 'erosion' and 'earth movement' (see *Preserve* [*I*] complaint, page 6), which do not appear to be the subject of the pollution exclusion. At this point, given that neither the plaintiffs['] nuisance cause of action nor the associated damages claims have been the subject of any discovery, we are not in a position to rule out that in *Preserve* [*II*] plaintiffs are seeking to recover damages for some form of property damage which is not subject to the exclusion."

Consistent with the foregoing opinions, State Farm advised Cold Creek in August 2001 that it would reimburse Cold Creek's litigation expenses in connection with the damages claim in *Preserve II*, but that it declined to pay such expenses in *Preserve I* and the mandate portion of *Preserve II*.

The issue of nuisance damage in *Preserve II* proceeded to a jury trial. According to plaintiffs' trial brief: "The compost facility trucks massive quantities of waste products into the valley. The waste then putrefies as part of the production process. The smell of the rotting waste products is overpowering, carrying for several miles. Defendants' own experts have tested the odors created by the composting operations. Their odor experts panel have described the stench from the defendants' composting operations in the following terms: rotten sewage, rotten fish, cat urine, stagnant water, sour garbage, manure, mold and rotten eggs. . . . [¶] The stench from the compost operation causes gagging, headache, watering eyes, nausea, and

sinus congestion in people living in areas around defendant's compost facility. . . . Heavy clouds of dust from the 18 wheeler double-wide trucks inundates homes, plants, and laundry drying on the line. Noise constantly bombards surrounding residents when defendants are working." Cold Creek's trial brief indicated that the facility was over one and one-half miles away from plaintiffs' properties, and argued that plaintiffs had failed to demonstrate that odor, dust, or noise from the operations rose to the level of an actionable nuisance.

The jury rendered special verdicts awarding five individual plaintiffs damages totaling $125,000 for "[d]iscomfort, annoyance, inconvenience or other non-economic losses." The jurors found that Cold Creek had created "a condition that was harmful to health, or . . . offensive to the senses, or . . . an obstruction to the free use of property" that could be abated and that interfered with plaintiffs' use or enjoyment of their land.

In a March 2004 posttrial report to State Farm, Cold Creek's defense counsel stated that plaintiffs and other lay witnesses testified to "experience[ing] odor" from the facility, and government officials testified that "verified odor complaints" had been lodged against the operation. Defense witnesses included an odor expert, a noise expert, and neighbors of plaintiffs, who testified "to the lack of odor, noise or dust impacts." After the verdicts were returned, counsel spoke with several jurors and learned that the jury "believed the Plaintiffs smelled something. Dust and noise were not nuisance factors."

In April 2004, State Farm obtained an opinion from independent coverage counsel as to its ongoing obligations in *Preserve II*. Counsel opined that claims based on odors from Cold Creek's facility were "probably sufficient" to constitute "bodily injury" under the policies.[1] This conclusion was based on the allegations in plaintiffs' trial brief that the odors caused gagging, headache, watering eyes, nausea, and sinus congestion, and counsel's understanding that there was testimony at trial "regarding nausea, but no evidence of medical treatment rendered for such illness." Allegations that "laundry hanging on the line outdoors was damaged as were patios, fruit trees and flowers which were covered by clouds of dust" constituted claims of "property damage" as defined in the policies.[2] None of the allegations were for

---

[1] The policies define "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from the bodily injury, sickness or disease at any time." (Boldface omitted.)

[2] The policies define "property damage" to mean: "a. physical injury to or destruction of tangible property, including all resulting loss of use of that property. All such loss of use will be considered to occur at the time of the physical injury that caused it; or [¶] b. loss of use of tangible property that is not physically injured or destroyed, provided such loss of use is

"personal injury" as defined in the policies because the coverage for "invasion of the right of private occupancy" of property was limited to "the landlord/tenant situation."[3]

Although some of plaintiffs' allegations were potentially covered by the policies, counsel concluded the policies' pollution exclusion eliminated any indemnification obligation for the damages awarded. Counsel reasoned that: "the only potentially covered claims for 'bodily injury' or 'property damage' are the result of the alleged fumes and dust which were dispersed or released from the insureds' compost operations. [¶] . . . [¶] [A]ny dust or other airborne chemicals would constitute an irritant or contaminant. Likewise, any noxious odors which cause nausea or any other physical ailment, would also be considered an irritant. Based upon the foregoing, it is our opinion that the absolute pollution exclusion eliminates any duty to indemnify the insureds in this situation." Counsel further concluded that State Farm could withdraw its defense of *Preserve II*: "At this point, it appears the only basis for defending the action was the possible claim for erosion and earth movement which could constitute 'property damage' and which would not be excluded by the pollution exclusion. However, we note the allegations regarding erosion and earth movement were contained in Preserve [I]. Those same allegations are not part of Preserve [II]. [¶] Furthermore, it does not appear that the issue of erosion or earth movement was a part of the case which was tried and now subject to a potential appeal. Any appeal at this point would be to challenge the amount of the award which is based upon non-covered claims. For this reason, it is our opinion that State Farm has satisfied its obligation to defend the insured and could withdraw from the defense at this point."

In May 2004, State Farm advised Cold Creek that it was withdrawing its defense of the *Preserve II* action, and refusing to indemnify Cold Creek for its liability in the case. State Farm's letter stated among other things that, even if plaintiffs' damages were for "bodily injury" or "property damage" under the policies, coverage was negated by the pollution exclusion.

In January 2005, an injunction "enjoining and abating commission of nuisance" was entered in *Preserve II*. The injunction prevented Cold Creek from conducting composting operations without implementing the dust control measures recommended by public agencies and the odor control measures specified in the injunction.

---

caused by physical injury to or destruction of other tangible property. All such loss of use will be considered to occur at the time of the occurrence that caused it."

[3] The polices define "personal injury" in relevant part to mean "injury other than bodily injury, arising out of one or more of the following offenses: [¶] . . . [¶] c. wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, by or on behalf of its owner, landlord or lessor."

In March 2005, Cold Creek sued State Farm herein for breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair business practices (Bus. & Prof. Code, § 17200 et seq.), for failures to defend and indemnify in *Preserve II.*

Both sides moved for summary judgment or summary adjudication. State Farm argued that the pollution exclusion foreclosed indemnity coverage for damages in *Preserve II* to the extent that the damages were awarded for odor and dust, and that damages awarded for noise were not covered by the policies irrespective of the exclusion. Cold Creek argued that the *Preserve II* damages were for "bodily injury," "property damage," or "personal injury" under the policies, and were not subject to the pollution exclusion. Each side cited the decision in *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635 [3 Cal.Rptr.3d 228, 73 P.3d 1205] (*MacKinnon*), in support of its position.

The court granted State Farm's motion for summary judgment, finding that the pollution exclusion was controlling, and ruling that:

"*Preserve II* did involve pollution subject to [that] exclusion. The odors emanating from the facility were determined to be a nuisance by a jury. This Court believes that an odor emanating from a compost plant that reaches the point of being declared a nuisance is pollution as defined by the *MacKinnon* Court.

"Furthermore, though State Farm extended a defense to Cold Creek for the nuisance portion of the *Preserve II* litigation, based on the pollution exclusion, it did not owe a duty to defend Cold Creek. Once the jury special verdicts in *Preserve II* were issued, and a judgment entered, it was evident that the basis for the verdicts against Cold Creek was pollution from their compost operation, an act that was not covered by the policy.

"Additionally, since Cold Creek had no insurance coverage for its acts of pollution, State Farm cannot . . . be held in breach of contract under either the business or umbrella policies nor can it be held in violation of [Business and Professions Code section] 17200, unfair business practices.

"Finally, this Court finds State Farm did not act in bad faith when it denied coverage and withdrew its defense of Cold Creek: the facts indicate that State Farm had good faith reliance on the advice of its counsel when it made the coverage decision, and there was a legitimate dispute as to State Farm's coverage obligations under California law."

## II. DISCUSSION

A. *Odor*

Cold Creek contends that the trial court erred in concluding that, by virtue of the pollution exclusion in the policies, State Farm had no duty of defense or indemnity with respect to the *Preserve II* damage claims based on odors emanating from the facility. We are called upon to independently review the trial court's interpretation of the policies and its granting of the motion for summary judgment. (*MacKinnon, supra,* 31 Cal.4th at pp. 641, 647 [summary judgments are review de novo; interpretation of an insurance policy is a question of law].)

Our analysis is governed by *MacKinnon,* which interpreted a pollution exclusion identical in material respects to the one here.[4] The issue in *MacKinnon* was whether the exclusion applied to exclude injury to a tenant from a landlord's allegedly negligent use of pesticides on his property. The court held that the exclusion did not apply because it did not "plainly and clearly exclude ordinary acts of negligence involving toxic chemicals such as pesticides." (*MacKinnon, supra,* 31 Cal.4th at p. 639.)

*MacKinnon* identified two schools of thought as to the scope of the exclusion. "One camp maintains that the exclusion applies only to traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occur[] in the normal course of business. These courts generally find ambiguity in the wording of the pollution exclusion when it is applied to such negligence and interpret such ambiguity against the insurance company in favor of coverage. The other camp maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution, and that the clause is as unambiguous in excluding the former as the latter." (*MacKinnon, supra,* 31 Cal.4th at p. 642.) The court cited California cases involving groundwater contamination from industrial operations or sewage-borne bacteria as examples of traditional environmental pollution. (*Id.* at p. 641, fn. 1.) The court cited cases from other jurisdictions showing that the narrower interpretation of the pollution exclusion represented the majority view. (*Id.* at p. 642, fn. 2.) In these cases, which presumably did not involve traditional environmental pollution, the injuries resulted from causes such as carbon monoxide leaks from a furnace or oven; inhalation of fumes from a concrete curing compound; toxic smoke emitted from a fire; soot and smoke emitted from candles; ingestion of lead paint chips; hydrogen sulfide

---

[4] The policy in *MacKinnon* excluded coverage for bodily injury or property damage resulting from " 'the actual, alleged, or threatened discharge, dispersal, release or escape of pollutants,' " and defined pollution in the same way as the State Farm policies. (*MacKinnon, supra,* 31 Cal.4th at p. 639.)

fumes accidentally emitted from a truck; insecticide accidentally sprayed on bystanders; and hydrocarbons and hydrofluoric acid accidentally released from oil refineries. (*Ibid.*)

The court rejected a broad, literal construction of the pollution exclusion that would encompass "virtually all acts of negligence involving substances that can be characterized as irritants or contaminants" (*MacKinnon, supra,* 31 Cal.4th at p. 649), and determined that the exclusion applied only "to injuries arising from events commonly thought of as pollution, i.e., environmental pollution" (*id.* at p. 653). The court adopted this interpretation for a number of reasons.

The court's reading was consistent with the historical background of the exclusion and the purpose of its implementation. The exclusion at issue, commonly referred to as the "absolute" pollution exclusion, was not formulated to exclude "all injuries from toxic substances," but rather as a means of avoiding " ' " 'potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment.*' " ' " (*MacKinnon, supra,* 31 Cal.4th at pp. 644, 645.)

The court's interpretation was consistent with the "familiar connotations" of the words used in the exclusion. (*MacKinnon, supra,* 31 Cal.4th at p. 652.) The court explained that the words of the exclusion were to be construed in their " 'ordinary and popular' sense" as a layperson would reasonably interpret them. (*Id.* at p. 649.) From that standpoint, the words "discharge," "dispersal," "release," and "escape" would imply "expulsion of the pollutant over a considerable area rather than a localized toxic accident [or injury] occurring in the vicinity of intended use." (*Id.* at p. 646; see also *id.* at pp. 651, 653.) The court observed that to "disperse" can mean to " 'spread *widely*' " (*id.* at p. 651), and that "[t]he notion of 'dispersal' as a *substantial* dissemination is reinforced by its use with the term 'pollutant.' Indeed, the word 'dispersal,' when in conjunction with 'pollutant,' is commonly used to describe the spreading of pollution widely enough to cause its dissipation and dilution." (*Ibid.*)

The court's interpretation also served to avoid absurd results. To regard every "irritant or contaminant" as a "pollutant" would "cut[] a broad and arbitrary swath through [liability insurance] protections" (*MacKinnon, supra,* 31 Cal.4th at p. 654) because "[v]irtually any substance can act under the proper circumstances as an 'irritant or contaminant' " (*id.* at p. 650). Without some limiting principle, the exclusion would apply to "virtually all injuries involving substances that cause harm" (*id.* at p. 654), including injuries that "few if any would think of . . . as arising from 'pollution' in any recognizable

sense," such as a child's accidental ingestion of a toxic substance left in an empty soft drink bottle (*id.* at p. 650).

As for the claim at issue in *MacKinnon*, the court found it "far from clear" that "injuries arising from the normal, though negligent, residential application of pesticides, would be commonly thought of as pollution." (*MacKinnon, supra,* 31 Cal.4th at p. 654.) The policy language did not clearly exclude such injuries because "it would be unusual to speak of the normal, intentional application of pesticides as a 'release' or 'escape' of pesticides," and "the application of pesticides in and around an apartment building does not plainly signify to the common understanding the 'dispersal' of a pollutant." (*Id.* at p. 651.) Moreover, "the term 'discharge' is commonly used with pesticides to describe pesticide runoff behaving as a traditional environmental pollutant rather than pesticides being normally applied." (*Id.* at p. 652.) Thus, "[w]hile pesticides may be pollutants under some circumstances, it is unlikely a reasonable policyholder would think of the act of spraying pesticides under these circumstances as an act of pollution. . . . [T]he 'common understanding of the word "pollute" indicates that it is something creating impurity, something objectionable and unwanted.' The normal application of pesticides around an apartment building in order to kill yellow jackets would not comport with the common understanding of the word 'pollute.' " (*Id.* at p. 654.)

 The decision in *MacKinnon* supports State Farm here. The odors emanating from Cold Creek's facility were unquestionably an "impurity, something objectionable and unwanted" in the air where the *Preserve II* plaintiffs lived; the odors "polluted" the air, as the term "pollute" is commonly understood. In the ordinary and popular sense of the words of the pollution exclusion, the odors were "discharged" and "released" by the composting and "escaped" from the facility. The odors spread a mile and a half to plaintiffs' homes—a "substantial dissemination" to the point of "dissipation and dilution" ordinarily understood as a "dispersal of pollutants" into the environment. The *Preserve II* plaintiffs did not suffer a "localized toxic accident" like the one in *MacKinnon*; they were harmed by a persistent byproduct of Cold Creek's business operations, what *MacKinnon* called "traditional environmental industrial pollution." (*MacKinnon, supra,* 31 Cal.4th at p. 641, fn. 1.) In *Garamendi v. Golden Eagle Ins. Co.* (2005) 127 Cal.App.4th 480, 486 [25 Cal.Rptr.3d 642] (*Garamendi*), the court held that, "unlike the residential use of a pesticide for the purpose of killing insects, the widespread dissemination of silica dust as an incidental by-product of industrial sandblasting operations most assuredly is what is 'commonly thought of as pollution' and 'environmental pollution' " under the reasoning of *MacKinnon*. Similarly here, we conclude that the widespread dissemination of offensive and injurious odors from a commercial compost facility is

"environmental pollution" under *MacKinnon*, and thus excluded from coverage by the pollution exclusion in the policies.

This conclusion is consistent with the one reached in *City of Spokane v. United Nat. Ins. Co.* (E.D.Wn. 2002) 190 F.Supp.2d 1209 (*Spokane*), which appears to be the only reported case involving the pollution exclusion's application to odors from a compost facility. The owner of the compost facility in that case was sued by nearby residents for damages caused by odors emitted from the facility. The owner incurred substantial defense costs, paid more than $4 million to settle the case, and sought indemnification under liability insurance policies that contained pollution exclusions. The court took into account how an average purchaser of insurance would have understood the language of the exclusions (*id.* at p. 1217), and held in favor of the insurers (*id.* at p. 1221). The court reasoned: "Although [d]efendants' pollution exclusions did not explicitly list 'odors' in the definitions for 'pollutant' or 'contaminant,' the policies clearly exclude coverage for odors produced by the Colbert Compost Facility. . . . [¶] . . . Reading the insurance policies to include coverage of odors from solid waste—although the policies clearly exclude coverage for gases, fumes, vapors, contaminants, and irritants— would require a strained interpretation and produce an absurd result. Migration of odors from a solid waste facility clearly constitutes contamination, or pollution, of the environment." (*Id.* at p. 1219.)

The same conclusion was reached in an analogous context in *City of Bremerton v. Harbor Ins. Co.* (1998) 92 Wn.App. 17 [963 P.2d 194] (*Bremerton*). There, residents in the vicinity of a sewage treatment plant sued for damages for " 'noxious and toxic fumes,' " and " 'foul and obnoxious odors and toxic gases' " emitted by the facility. (*Id.* at p. 195.) The court held that the pollution exclusion applied: "The policy defines a 'pollutant' as any 'irritant or contaminant' and specifically lists 'fumes' and 'gases' as examples. The language unambiguously excludes claims arising from 'fumes' and 'gases' from coverage. Furthermore, the specified examples of 'irritants or contaminants' in the exclusion language are listed as non-exclusive types of 'pollutants' subject to exclusion from coverage. The list is illustrative and not exhaustive and odors are effectively excluded as well. A reasonable person reviewing this language would expect that 'noxious and toxic fumes' and 'foul and toxic odors and gases' are 'pollutants' within the meaning of the pollution exclusion." (*Id.* at p. 197; see also *Titan Holdings Syndicate v. City of Keene, N.H.* (1st Cir. 1990) 898 F.2d 265, 267, 269 [pollution exclusion negated coverage for odors from sewage treatment plant]; *Tri-Municipal Sewer Commission v. Continental Insurance Company* (N.Y.App.Div. 1996) 223 A.D.2d 639 [636 N.Y.S.2d 856, 857] [same].) The pollution exclusion has likewise been interpreted under California law to negate coverage for

odors emanating from a manufacturing facility. (*Hydro Systems, Inc. v. Continental Ins. Co.* (C.D.Cal. 1989) 717 F.Supp. 700, 701–702 (*Hydro Systems*).)

Cold Creek contends, like the insured in *Bremerton*, that the pollution exclusion does not extend to odors because that word does not appear in the exclusion's definition of "pollution." However, odors are plainly a "gaseous . . . irritant or contaminant" under the wording of the definition. Although *MacKinnon* precludes a literal reading of the exclusion to encompass all potential irritants and contaminants, the odors here, as we have explained, constitute "environmental pollution" and are therefore subject to the exclusion under *MacKinnon*'s analysis.

■ Cold Creek argues that compost odors do not qualify as a "pollutant" because they "do not pose a significant health threat or cause serious injuries."[5] Cold Creek relies on a statement in *Regional Bank of Colo. v. St. Paul Fire & Marine* (10th Cir. 1994) 35 F.3d 494, 498, a case applying Colorado law, that to qualify as a pollutant, irritants or contaminants "must occur in a setting such that they would be recognized as a toxic or particularly harmful substance in industry or by governmental regulators." This statement is at odds with California law. California cases before and after *MacKinnon* indicate that a substance need not be "toxic or particularly harmful" to be considered a "pollutant" under the pollution exclusion. (See *Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472, 1481 [42 Cal.Rptr.2d 101] [exclusion "does not limit pollutants to hazardous substances"]; *Ortega, supra,* 141 Cal.App.4th at pp. 974, 990 [dirt and rocks discharged into a creek were pollutants subject to the exclusion].)

■ In any event, we are not persuaded compost odors could never be viewed as hazardous waste. Cold Creek submits that it is legally prevented from composting hazardous waste under Public Resources Code section 40116, which defines "compost" to "include[] vegetable, yard, and wood wastes which are not hazardous waste." But otherwise nonhazardous wastes can become hazardous if they are not handled properly. Public Resources Code section 40141, subdivision (a) defines "hazardous waste" to mean "a waste, or combination of wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may . . . [¶] . . . [¶] . . .

---

[5] Cold Creek also states on the one hand that it accepts only "100% natural, organic materials for composting," but disclaims on the other hand any contention "that a natural process cannot produce pollution." If Cold Creek means to suggest that "natural" substances cannot be pollutants, the suggestion is untenable. (See *East Quincy Services Dist. v. Continental Ins. Co.* (E.D.Cal. 1994) 864 F.Supp. 976, 979–980, fn. 8 [" 'a natural part of the earth' " can be a pollutant under the exclusion]; *Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969, 974, 990 [46 Cal.Rptr.3d 517] (*Ortega*) [dirt and rocks were pollutants].)

[p]ose a substantial present or potential hazard to human health or environment when improperly treated, stored, transported, or disposed of, or otherwise managed." It is evident from the $4 million settlement in the *Spokane* case and the $125,000 damage award here that compost odors can pose a substantial hazard to the environment and human health. The compost odors in this case *were* "toxic" in the sense that they caused physical harm, a point Cold Creek necessarily conceded in arguing below that the *Preserve II* plaintiffs suffered "bodily injury" as defined in the policies. ■ Cold Creek notes the lack of evidence that the *Preserve II* plaintiffs sought medical treatment, or suffered any "irreversible" health problems because of the odor, but it is the cause, not the extent, of the injury that determines whether "environmental pollution" has occurred. (See *Garamendi, supra,* 127 Cal.App.4th at p. 486 ["environmental pollution" is not limited to instances of " 'wholesale environmental degradation' "].)

Cold Creek submits that compost odor cannot be considered a pollutant because it is not regulated as one under environmental laws. (See *Ortega, supra,* 141 Cal.App.4th at p. 980 ["state and federal environmental laws may provide insight into the scope of the policies' definition of pollutants without being specifically incorporated in those definitions"].) Cold Creek seeks to distinguish *Ortega, Garamendi, Hydro Systems,* and *Spokane* on that ground. (See *Ortega, supra,* 141 Cal.App.4th at p. 980 [dirt and rocks could be pollutants under the Clean Water Act (33 U.S.C. § 1251 et seq.)]; *Garamendi, supra,* 127 Cal.App.4th at p. 486 [federal regulations identified silica dust as an air contaminant]; *Hydro Systems, supra,* 717 F.Supp. at p. 702 [styrene gas was identified as an "air contaminant" or "air pollutant" under the Health & Saf. Code]; *Spokane, supra,* 190 F.Supp. at p. 1219 [compost facility was registered under state law as an "air contaminant source"].)

■ Contrary to Cold Creek's argument, odors in general, and compost odors in particular, are recognized as pollutants under California law. Health and Safety Code section 39013 defines an "air contaminant or "air pollutant" to include, among other things, "fumes, gases, [and] odors" discharged or released into the environment. "[O]dors emanat[ing] directly from [a] compost facility or operations" (Health & Saf. Code, § 41705, subd. (a)(2)) are addressed in the "Nonvehicular Air Pollution Control" provisions of the Health and Safety Code (Health & Saf. Code, § 41500 et seq.). Under Health and Safety Code section 41705, subdivision (b), and Public Resources Code section 43209.1, subdivision (a), complaints received by air pollution control districts and air quality management districts "pertaining to an odor emanating from a compost [facility or operation]" are referred to local enforcement agencies with jurisdiction for "appropriate enforcement actions" in consultation with the districts. Public Resources Code section 43209.1, subdivisions (b) and (c) require the California Integrated Waste Management Board to consult with local enforcement agencies, air pollution control districts, and air

quality management districts to develop recommendations "to ensure that enforcement agencies respond in a timely and effective manner to complaints of odors emanating from composting facilities" (*id.*, subd. (b)), and to promulgate odor management regulations for organic compositing sites. (See Cal. Code Regs., tit. 14, § 17863.4 [describing the odor impact minimization plans required for compost facilities].) Compost odor is thus regulated by air pollution officials as an air pollutant in California, a reality reflected at the jury trial in *Preserve II*, where the plaintiffs' evidence included testimony by an air quality management district inspector about the "verified odor complaints" he had received.

Cold Creek reads *MacKinnon* as restricting the pollution exclusion "to those instances in which it would have been obvious to an ordinary layperson that the activity was specifically excluded from coverage," and maintains that "since a reasonable person might conclude that composting odors are not pollution, the exclusion must be construed in favor of coverage." Cold Creek's opening brief reasons that "[s]ince composting is universally hailed as eco-friendly, and since no hazardous substances can lawfully be composted at Cold Creek, it would not be reasonable to expect Mileck [Cold Creek's principal], who engages in that business, to consider himself a polluter. Nor would it be reasonable for Mileck to believe that alleged offensive odors from compost constituted air pollution." However, as we have said, Cold Creek's alleged inability to compost hazardous substances does not preclude application of the pollution exclusion, and Cold Creek cannot reasonably claim to have been surprised, given the regulatory regime under which it operates, that compost odor would be regarded as a form of air pollution. As for the "eco-friendly" nature of the business, Cold Creek's reply brief disavows any assertion "that a business that benefits the environment cannot be a polluter."

*MacKinnon* identified a "plain meaning" of the pollution exclusion that an "ordinary layperson would adopt," namely, that it applied to "events commonly thought of as pollution, i.e., environmental pollution." (*MacKinnon, supra*, 31 Cal.4th at pp. 652–653.) Because that interpretation was reasonable and because it militated in favor of coverage for the loss in *MacKinnon*, the court did not need to decide whether there were other reasonable interpretations of the exclusion. (*Id.* at pp. 655–656.) Here, because the interpretation *MacKinnon* identified would bar recovery, other reasonable interpretations must be entertained. However, none has been established. Like any layperson, Cold Creek would be deemed to read the exclusion as applying to environmental pollution of the sort that occurred here. Cold Creek has identified nothing in the language of the exclusion, or in the nature of its business, the materials it handles, or the laws under which it operates, that would support any other reasonable interpretation.

■ Cold Creek and amicus curiae United Policyholders note *MacKinnon* reaffirmed the rule that, to be effective, coverage exclusions must be conspicuous, plain, and clear. (*MacKinnon, supra,* 31 Cal.4th at p. 648.) United Policyholders submits that this rule should apply with particular force where injuries are the readily foreseeable byproduct of the insured's normal business operations—"everyday activities gone slightly, but not surprisingly, awry." (*Pipefitters Welfare Educ. Fund v. Westchester Fire* (7th Cir. 1992) 976 F.2d 1037, 1044.) United Policyholders cites *West American Insurance Co. v. Tufco Flooring East* (1991) 104 N.C.App. 312 [409 S.E.2d 692] (*Tufco*), disapproved on another ground in *Gaston County Dyeing Machine Co. v. Northfield Ins. Co.* (2000) 351 N.C. 293 [524 S.E.2d 558], and *American States Insurance Co. v. Kiger* (Ind. 1996) 662 N.E.2d 945 (*Kiger*), as cases exemplifying their point.

*Tufco* declined to interpret the pollution exclusion to bar coverage for injuries caused by fumes released by the insured in the performance of its floor resurfacing business. (*Tufco, supra,* 409 S.E.2d at pp. 693, 700.) The court reached this decision in part because "[the insured] purchased a commercial liability policy to protect it from liabilities arising from the very type of activity at issue here. . . . To allow [the insurer] to deny coverage for claims arising out of [the insured's] central business activity would render the policy virtually useless to [the insured]." (*Id.* at p. 697.) *Kiger* held that the pollution exclusion did not bar coverage for a gasoline leak from a gas station because the exclusion did not specifically list gasoline as a pollutant. (*Kiger, supra,* 662 N.E.2d at pp. 946, 949.) The *Kiger* court was "troubled" by the insurer's contrary interpretation, which "[made] it appear that [the insured] was sold a policy that provided no coverage for a large segment of the gas station's business." (*Id.* at p. 949.) The court found it "to say the least, strange" that "an insurance company would sell a 'garage policy' to a gas station when that policy specifically excluded the major source of potential liability." (*Id.* at p. 948.)

United Policyholders argues that Cold Creek's case is like *Tufco* and *Kiger* because the *Preserve II* plaintiffs were injured by "something normally generated in the course of [Cold Creek's] ordinary business." United Policyholders ventures in this regard that "[e]veryone, including the average person with a backyard compost pile, knows that compost creates offensive odors."

This argument is not persuasive. The rule that an exclusion must be conspicuous, plain, and clear is satisfied as to the loss claimed here. The widespread dissemination of offensive and injurious compost odors as occurred in this case is environmental pollution, which is clearly and plainly excluded from coverage by the words of the pollution exclusion understood in their ordinary and popular sense. This conclusion does not render Cold

Creek's insurance coverage illusory. While *some* odor may be expected from composting operations, such operations are more than "slightly awry" when, in the trial court's words, that odor has "reache[d] the point of being declared a nuisance" to neighbors a mile and a half away and results in the type of physical problems described by the *Preserve II* plaintiffs. No evidence or authority indicates that normal compost operations would involve such a hazard.

We therefore independently agree with the trial court that State Farm had no duty under the policies to defend or indemnify Cold Creek from liability for damages sought and recovered by the *Preserve II* plaintiffs for compost odors. This conclusion disposes of all causes of action, including those for unfair business practices and bad faith, insofar as they involve odors from Cold Creek's operations. (See Bus. & Prof. Code, § 17204 [plaintiff must have been injured by alleged unfair business practice]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619] [no bad faith liability when no coverage or duty to defend].)

## B. *Dust and Noise*

 Cold Creek devotes it opening brief on appeal entirely to the issue of the pollution exclusion's application to the odor claims in *Preserve II*. Cold Creek then argues, for the first time in its reply brief, that even if odors fall within the pollution exclusion, dust and noise do not. Arguments cannot properly be raised for the first time in an appellant's reply brief, and accordingly we deem them waived in this instance. (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [27 Cal.Rptr.3d 648, 110 P.3d 903] [arguments initiated at that stage are generally not considered].)

 The arguments are deficient in any event. Dust has been held to be a pollutant within the meaning of the pollution exclusion in California and elsewhere (*Garamendi, supra,* 127 Cal.App.4th at pp. 485–486 [silica dust]; *SDCP v. Wausau Underwriters Ins. Co.* (2000) 2000 SD 116 [616 N.W.2d 397, 406] [cement dust]), and dust is recognized and regulated as a form of air pollution under California environmental law (*Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1454 [91 Cal.Rptr.2d 322] [particulate dust from quarry project]; Health & Saf. Code, § 40731, subd. (a) ["fugitive dust emissions" from "travel on unpaved roads"]). Cold Creek's arguments about dust are confined to a brief paragraph asserting that dust is not commonly thought of as a pollutant, and attempting to distinguish *Garamendi* on the ground that silica dust had been classified by regulation as an air contaminant. Those arguments failed in the context of coverage for odors, and they do not have any greater merit with respect to dust when viewed by what was presented in this case.

As for noise, it is not sufficient for Cold Creek to argue that claims for noise are outside the pollution exclusion. Cold Creek must demonstrate that such claims involved "bodily injury," "property damage," or "personal injury" under the policies (*MacKinnon, supra,* 31 Cal.4th at p. 648 [the "burden is on the insured to establish that the claim is within the basic scope of coverage"]), but it makes no attempt to do so in its briefing on appeal.

## III. DISPOSITION

The judgment is affirmed.

Swager, J., and Margulies, J., concurred.

A petition for a rehearing was denied December 10, 2007, and appellants' petition for review by the Supreme Court was denied February 20, 2008, S159503.