Filed 1/21/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RUBEN GAMERBERG, | B290755 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC604287) |
| v. | |
| 3000 E. 11TH ST., LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elizabeth Feffer, Judge. Reversed and remanded.

Zakariaie & Zakariaie, Jack M. Zakariaie; Greines, Martin, Stein & Richland, Edward L. Xanders and Meehan Rasch for Defendant and Appellant.

Schorr Law, Zachary D. Schorr and Stephanie C. Goldstein for Plaintiff and Respondent.

—————————————

In 1950 the owner of property in Boyle Heights agreed to provide eight parking spaces to the owner of a neighboring lot who wanted to build a warehouse exceeding the maximum allowable square footage then permitted by the Los Angeles Municipal Code (LAMC).  A notarized parking affidavit documenting the agreement was filed with the Los Angeles Department of Building and Safety (LADBS), which then issued the second property owner a building permit and, ultimately, a certificate of occupancy for the completed warehouse.  The parking affidavit was never recorded; nor is there any evidence the eight parking spaces were ever identified by either property owner or used by the second property owner or his successors.

3000 E. 11th St., LLC, the successor in interest to the first landowner, appeals from the judgment entered after a bench trial upholding the unrecorded parking affidavit as an irrevocable license in favor of Ruben Gamerberg, the successor in interest to the second property owner.  The LLC, through its owners Steve Soroudi and his father, contends the trial court erred as a matter of law by upholding the parking affidavit even though Soroudi did not have actual or constructive notice of the parking affidavit when he purchased the property.  We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1994 Soroudi and his father purchased 3001 E. 12th Street in Boyle Heights through a predecessor to their jointly owned limited liability corporation, 3000 E. 11th St., LLC.  Soroudi inspected the property before purchase and saw no indication anyone other than the previous owner's employees had parked on the property.  Neither the title report nor the deed he reviewed mentioned the 1950 parking affidavit or listed it as an encumbrance on the property.  From 1994 until 2013 Soroudi

2

allocated the parking spaces on the lot to his tenants.  He had no knowledge of any outside claim to parking rights on the property.

Gamerberg and his wife purchased 3045 E. 12th Street in 2007.  He, too, was unaware of the 1950 parking affidavit or any previous use by his predecessors of parking spaces on 3001 E. 12th Street.  In 2013, however, when Gamerberg began consulting with LADBS about expanding and remodeling the warehouse on his property, an LADBS plan checker informed Gamerberg there was a parking affidavit for the property on file.  The notarized affidavit, executed in 1950 between the respective owners of the two parcels, asserted that the owner of 3001 E. 12th Street would provide eight parking spaces to "be available at all times for tenants at 3045 E. 12th St."[1]  The plan checker explained that the spaces indicated on the parking affidavit could be "grandfathered in" to meet the parking

---

[1]     The warehouse then planned for 3045 E. 12th Street was required to provide eight off-street parking spaces.  At the time the affidavit was executed, the LAMC did not require the document be recorded.  In 1958 the LAMC was amended to require that all such agreements be recorded.  (LAMC, art. 2, § 12.26, subd. (E)(5) ["5.  Recorded Agreements.  (Amended by Ord. No. 111,049, Eff. 5/3/58.)  Whenever the off-street automobile parking spaces required by this section are provided on a different lot from that on which the use they are to serve is located, as a prerequisite to the issuance of the required building permit or certificate of occupancy, the owner or owners of said lot on which parking is to be provided shall record an agreement in the Office of the County Recorder of Los Angeles County, California, as a covenant running with the land for the benefit of the City of Los Angeles, providing that such owner or owners shall continue to maintain said parking spaces so long as the building or use they are intended to serve is maintained."].)

3

requirements for any expansion, as long as he notified the other owner of the planned construction and Gamerberg's need for the eight spaces described in the affidavit.

In October 2013 Gamerberg's architectural designer sent Soroudi a certified letter attaching the parking affidavit and stating: "This letter serves as verification for [the] existence of [a] Parking Affidavit granting use of [eight] Parking Spaces to tenants/owners of 3045 East 12th Street . . . at 3001 East 12th Street. . . . [P]lease provide us with exact locations as soon as possible."

Soroudi returned the receipt for the certified letter, consulted his attorney and made a claim on his title insurance. He did not respond to the letter, and neither Gamerberg nor his architectural designer contacted him further. The architectural designer provided the plan checker with a copy of the return receipt for the certified letter as proof Soroudi had been notified. Based on the receipt, the plan checker approved Gamerberg's plans for the warehouse expansion; and LADBS issued a building permit for the expansion in January 2014.

Nearing completion of the expansion in March 2015, Gamerberg, having already spent approximately $600,000 adding a new building behind the existing warehouse, dividing the warehouse space into five units and adding a mezzanine space,[2] again contacted Soroudi to confirm the location and availability of the parking spaces. Soroudi requested documentation and

---

[2] To comply with City parking requirements, Gamerberg had added two parking spaces, as well as parking for bicycles, in front of the warehouse and had been credited with the eight spaces described in the parking affidavit. The expansion project ultimately cost approximately $800,000.

4

informed Gamerberg the matter had been referred to his counsel. In July 2015 Gamerberg again demanded identification of the parking spaces, but Soroudi said his lawyer was still reviewing the issue. LADBS advised Gamerberg that the parking affidavit gave him the right to the eight parking spaces but that, if he was not able to gain access to the spaces, it was a civil matter between him and his neighbor.

Gamerberg filed his complaint in this action on December 16, 2015, asserting causes of action seeking a declaration of an equitable servitude, an equitable easement or an irrevocable license.[3] He proceeded to trial solely on the third cause of action for an irrevocable license. After a bench trial at which Gamerberg and Soroudi, as well as an LADBS supervisor, each testified, the court ruled an irrevocable license had been created in 1950 when Gamerberg's predecessor had expended money to build the warehouse in reliance on Soroudi's predecessor's agreement to provide eight parking spaces. Relying principally on the decision in *Noronha v. Stewart* (1988) 199 Cal.App.3d 485 (*Noronha*), the court held the license was binding on the 1950 property owners' successors in interest even if they took title with no knowledge of the parking affidavit.

---

[3] Gamerberg also filed a lis pendens against Soroudi's property, which Soroudi successfully moved to expunge after the superior court concluded Gamerberg had not established probable validity of any of his claims.

**DISCUSSION**

1. *Standard of Review*

"The grant of an irrevocable license is 'based in equity,'" which we review for an abuse of discretion. (*Richardson v. Franc* (2015) 233 Cal.App.4th 744, 751 (*Richardson*).) "'Under that standard, we resolve all evidentiary conflicts in favor of the judgment and determine whether the trial court's decision "'falls within the permissible range of options set by the legal criteria.'"'" (*Ibid.*)

The legal question raised in this appeal is whether the 1950 parking affidavit can be construed to create an irrevocable license in favor of Gamerberg that is binding on Soroudi, a subsequent purchaser without notice. Gamerberg dismissed his causes of action seeking declarations of an equitable servitude or equitable easement, each of which typically requires, among other formalities, actual or constructive notice to bind a subsequent purchaser.[4] (See, e.g., *Taormina Theosophical Community, Inc. v. Silver* (1983) 140 Cal.App.3d 964, 972 ["'[e]ven though a covenant does not run with the land, it may be enforceable in

---

[4]    The parking affidavit also failed to comply with the formal requirements then in effect to establish a covenant running with the land. (See Civ. Code, former § 1468.) Former section 1468 provided: "A covenant made by the owner of land with the owner of other land to do or refrain from doing some act on his own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee, and which is made by the covenantor expressly for his assigns or to the assigns of the covenantee, runs with both of such parcels of land." The parking affidavit, completed on a form provided by the LADBS, did not contain an express statement the agreement was intended to bind the assignees of the original owners.

equity against a transferee of the covenantor who takes with knowledge of its terms under circumstances which would make it inequitable to permit him to avoid the restriction,'" quoting *Marra v. Aetna Construction Co.* (1940) 15 Cal.2d 375, 378]; see also *Mesmer v. Uharriet* (1916) 174 Cal. 110 ["A purchaser of land for value takes subject only to interests in the land of which he has actual notice or which appear of record.  The rule applies as well to easements as to claims of a greater interest."].)

  2. *The Characteristics of an Irrevocable License*

  "When a landowner allows someone else to use her land, the owner is granting a license.  A license may be created by express permission or by acquiescence (that is, by 'tacitly permit[ing] another to repeatedly do acts upon the land' 'with full knowledge of the facts' and without objecting)."  (*Shoen v. Zacaria* (2019) 33 Cal.App.5th 1112, 1119 (*Shoen*).)  Unlike covenants that run with the land, such as easements, a license is a personal right and confers no interest in land:  "[I]t merely makes lawful an act that otherwise would constitute a trespass." (*Richardson, supra*, 233 Cal.App.4th at pp. 758-759; see *Eastman v. Piper* (1924) 68 Cal.App. 554, 560 ["'a valid license to enter on land . . . rests on the distinction that a license is only an authority to do an act or series of acts on the land of another, and passes no estate or interest therein'"]; see Smith, Neighboring Property Owners (Dec. 2019 supp.) § 7:2 ["A license is best understood as a residuary category, which apples whenever an interest does not meet the definitional parameters of a lease or easement.  A license, commonly viewed as an interest of much less significance than other property rights, is often stated to be not an interest in land at all, but only the mere permission of the landowner."].)

In keeping with a license's permissive nature, "'[a] licensor generally can revoke a license at any time without excuse or without consideration to the licensee.'" (*Richardson*, *supra*, 233 Cal.App.4th at p. 751; accord, *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 36 ["a license is normally revocable at will"].)  Moreover, "a license, being a mere personal privilege, is never extended to the heirs or assigns of the licensee.  Indeed, any attempt by the licensee to assign the license ordinarily destroys and terminates it." (*Eastman v. Piper*, *supra*, 68 Cal.App. at p. 562; accord, *Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633, 637; *Richardson*, at p. 751; see 6 Miller & Starr, Cal. Real Estate (4th ed. 2019) § 15.2.)

Nonetheless, "[a]n otherwise revocable license becomes irrevocable when the licensee, acting in reasonable reliance either on the licensor's representations or on the terms of the license, makes substantial expenditures of money or labor in the execution of the license, and the license will continue 'for so long a time as the nature of it calls for.'" (*Richardson*, *supra*, 233 Cal.App.4th at pp. 757-758, quoting *Stoner v. Zucker* (1906) 148 Cal. 516, 520 (*Stoner*); see *Cooke v. Ramponi* (1952) 38 Cal.2d 282, 286 (*Cooke*); *Shoen*, *supra,* 33 Cal.App.5th at p. 1119; *Hammond v. Mustard* (1967) 257 Cal.App.2d 384, 389.)  This principle is grounded upon "the doctrine of equitable estoppel; the license, similar in its essentials of an easement, is declared to be irrevocable to prevent the licensor from perpetrating a fraud upon the licensee." (*Cooke*, at p. 286; see *Richardson*, at p. 751 [in such cases, "the licensor is said to be estopped from revoking the license, and the license becomes the equivalent of an easement, commensurate in its extent and duration with the right to be enjoyed"].)  "[C]ourts may exercise their power to

8

declare a license irrevocable only if the expenditures in reliance on the license are 'substantial,' 'considerable' or 'great,'" a requirement that ensures "courts use their power to create irrevocable licenses sparingly."[5]  (*Shoen*, at pp. 1119-1120.)  "'A license remains irrevocable for a period sufficient to enable the licensee to capitalize on his or her investment.  He can continue to use it only as long as justice and equity require its use.'" (*Richardson*, at p. 758.)

> 3. *An Irrevocable License Is Not Binding on a Subsequent Purchaser Who Takes Without Notice*
>
> > a. <u>*Noronha*</u> *does not accurately characterize the assignability of an irrevocable license*

Assuming the 1950 parking affidavit created an irrevocable license in favor of Gamerberg's predecessor and against Soroudi's based on the expenditures in building the original warehouse, the determinative issue here is whether that license bound Soroudi, a

---

[5]     "Courts have faithfully limited the exercise of their power to declare a license to be irrevocable to those situations in which the licensee has expended substantial amounts of money or labor in reliance on a license.  Nearly every case where a license has been declared irrevocable has involved the licensee's permanent alteration of the land and the ensuing upkeep, whether by building, altering or upgrading a roadway [citations], constructing a ditch, canal or levee to transport water [citations], erecting a wall [citation], or raising living quarters [citation].  The high-water mark in this regard is *Richardson, supra,* 233 Cal.App.4th 744, which upheld an irrevocable license based upon the licensee's extensive acts of landscaping that entailed the installation of irrigation and lighting systems; the purchase, planting and replanting of several large and expensive trees for more than two decades; and the daily watering and lighting of that landscaping."  (*Shoen, supra,* 33 Cal.App.5th at p. 1120.)

9

subsequent purchaser without notice. The trial court based its ruling Soroudi was bound by the license on *Noronha, supra,* 199 Cal.App.3d 485, in which a purchaser of a lot in a subdivision received permission from the (apparent)[6] owner of the neighboring lot to construct a fence that encroached on the neighboring lot. Though the completed fence was open and obvious to the couple who later bought the neighboring lot, they claimed they had not realized the fence encroached on their property. The court of appeal found the lot owner who built the fence was entitled to an irrevocable license based on his expenditures on the fence, which "acts, for all purposes, as an easement, estopping the grantor and his successor from revoking it." (*Id.* at p. 490.) The court rejected the claim by the new owners of the neighboring lot that they had not understood the fence was on their property, because the prior owner testified he had told them of this fact at the time of purchase. (*Id.* at p. 491.) Notwithstanding this factual basis for a finding of actual notice, the court stated, "Nor is plaintiffs' knowledge required for the license to become irrevocable," reasoning that once the expenditures had been made, "'the license will continue for so long a time as the nature of it calls for.'"[7] (*Ibid.*, quoting *Cooke, supra,* 38 Cal.2d at p. 286.)

_____

[6] *Noronha* is more frequently cited for its holding that a grantor who subsequently takes title in property is bound under the doctrine of after-acquired title for promises made to a grantee who believed the grantor already held title. (*Noronha, supra,* 199 Cal.App.3d at pp. 489-490.)

[7] This language misstates the relevance of notice to irrevocable licenses. Notice to a subsequent purchaser does not affect a finding of irrevocability against the original grantor;

10

The analysis in *Noronha* is flawed, however; the court failed to recognize that not one of the cases finding a license irrevocable, including *Cooke*, *Stoner* and *Richardson*, addressed the rule in the context of a subsequent purchaser without notice.[8] Soroudi argues the correct rule is articulated in *Churchill v. Russell* (1905) 148 Cal. 1 (*Churchill*), in which the Supreme Court considered a parol agreement (or license) permitting a neighboring landowner and his wife to draw water from a well on the grantor's property. The neighbors not only drew the allocated water from the well but also made valuable improvements on the land. When the grantor died, the subsequent purchaser of the property sought an injunction to stop the neighbors from diverting water. The Court agreed the license would have been irrevocable against the original grantor, but held it was not against the subsequent purchaser who had taken the property without notice of the agreement: "Under these circumstances it was necessary for the defendants, in asserting their equitable interest, to allege and prove, and for the court to find, the existence of such notice in order to support their equitable claim. This proposition is so familiar that no citation of authorities is necessary to support it." (*Id.* at p. 6; see also *Blankenship v.*

_____

rather, it governs the issue of assignability to subsequent purchasers, as set forth below.

8      Notwithstanding Gamerberg's assertion that the holding in *Noronha* is "binding precedent," we are not obligated to follow a decision by a court of appeal with which we disagree. (*Martinez v. Public Employees' Retirement System* (2019) 33 Cal.App.5th 1156, 1171; see *Gonzalez v. Lew* (2018) 20 Cal.App.5th 155, 166, fn. 7 ["[t]here is no horizontal stare decisis in the California Court[s] of Appeal"]; *Jessen v. Mentor Corp.* (2008) 156 Cal.App.4th 1480, 1490, fn. 10 [same].)

11

*Whaley* (1899) 124 Cal. 300, 304-305 [license to use and expand ditch for irrigation may have been irrevocable against original grantor but was not against subsequent purchasers if they took without notice, who were "protected by the recording acts" against "secret defects in a title"; case remanded for further findings as to notice].)

That the Supreme Court in *Churchill* accurately stated the common law rule that irrevocable licenses do not survive transfer of the property to a purchaser without notice is confirmed by the statements of commentators and holdings of courts in other jurisdictions. For instance, "[a] subsequent purchaser of the servient property takes title subject to an irrevocable license if such purchaser could be charged with notice of the usage at the time of purchase. Hence, a subsequent purchaser with notice cannot revoke the license, but it has been held that a bona fide purchaser without notice receives the land free of the irrevocable license." (Bruce & Ely, The Law of Easements and Licenses in Land (2019) § 11:9; accord, 8 Thompson on Real Property (2019) § 64.05(b) ["Even though the license is held to be irrevocable it may still be lost if the property is sold to a bona fide purchaser. Thus in the case of a buried water line it was held that the sale of the burdened property to a party who had no notice of its existence resulted in termination of the interest."]; *Industrial Disposal v. City of East Chicago* (Ind.Ct.App. 1980) 407 N.E.2d 1203, 1206 ["our courts have held that where an owner of real estate gives a license which becomes 'irrevocable' and then sells the burdened estate to a third party, who purchases in good faith for value and without notice of the license, or of such facts as would put a man of ordinary prudence on inquiry, the third party takes the land free of any rights of the licensee"].) Conversely, in

12

*Blackburn v. Lefebvre* (Ala.Ct.Civ.App. 2007) 976 So.2d 482 the court held that an irrevocable license to use a boat pier was enforceable against a subsequent purchaser because the underlying agreement had been recorded and thus provided notice to the purchaser. (*Id.* at p. 495; see also *Tatum v. Dance* (Fla.Dist.Ct.App. 1992) 605 So.2d 110, 112 ["a subsequent vendee having notice of the licensee's use at the time of purchase takes the land burdened with the license"]; *Kovach v. Gen. Tel. Co. of Pennsylvania* (Pa.Super. Ct. 1985) 489 A.2d 883, 885 ["[o]nce irrevocability is established, 'successors-in-title take subject to an irrevocable license if they had notice of the license before purchase'"].)

> b. *To the extent an irrevocable license functions as an easement, it must be recorded to bind subsequent purchasers without actual notice*

Struggling to parse the various threads of common law servitudes in the context of modern commercial settings, Division Three of the Fourth District once observed, "Ultimately, the label given to [the plaintiff's] 'interest' is of little importance. Arrangements between landowners and those who conduct commercial operations upon their land are so varied that it is increasingly difficult and correspondingly irrelevant to attempt to pigeonhole these relationships as 'leases,' 'easements,' 'licenses,' 'profits,' or some other obscure interest in land devised by the common law in far simpler times. Little practical purpose is served by attempting to build on this system of classification." (*Golden West Baseball Co. v. City of Anaheim*, *supra*, 25 Cal.App.4th at p. 36; see French, *Toward A Modern Law of Servitudes: Reweaving the Ancient Strands* (1982) 55 So.Cal. L.Rev. 1261 ["[t]he law of easements, real covenants, and

13

equitable servitudes is the most complex and archaic body of American property law remaining in the twentieth century"]; French, *supra*, 55 So.Cal. L.Rev. at pp. 1262-1263 ["[t]he advent of comprehensive governmental land use regulation in the twentieth century actually increased the incidence of private land use arrangements for two reasons:  public regulation itself often uses private servitudes as tools of regulation; and the inherent shortcomings of public regulation encourage private arrangements"].)

Attempting to simplify this doctrinal thicket, the Restatement Third of Property, Servitudes, promulgated in 2000, "swe[pt] away negative easements, equitable servitudes, and executed parol licenses because the doctrinal differences that formerly distinguished these servitude categories have been eliminated."  (French, *Highlights of the New Restatement* (*Third*) *of Property:  Servitudes* (2000) 35 Real Prop. Prob. & Tr. J. 225, 228; see Rest.3d Property, Servitudes, §§ 1.2(4) ["[a]s used in this Restatement, the term 'easement' includes an irrevocable license to enter and use land in the possession of another"]; 7.14, com. a ["[i]nstead of drawing a distinction between servitudes based on the way they were created, the rules stated in this section distinguish among them on the basis of the function they serve"].) The Restatement takes the position "that all unrecorded servitude benefits, regardless of the manner of their creation, are subject to extinguishment under the recording act.  The rationale is that societal welfare is generally enhanced by increasing the ability to determine land titles by resort to the public land records because it reduces the costs and increases the security of transactions in land.  The benefits produced by subjecting all servitudes, whether written or unwritten, to extinguishment

14

under the recording act will outweigh the social costs involved in the loss of useful servitudes and the measures knowledgeable servitude holders will take to protect against extinguishment." (Rest.3d Property, Servitudes, § 7.14, com. a; see *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 354-355 (*Citizens for Covenant Compliance*) [recognizing efforts to merge common law servitude doctrines: "Whether the amendments to [Civil Code] section 1468 have accomplished this fusion in California is beyond the scope of the narrow issue before us"].)

Like the Supreme Court in *Citizens for Covenant Compliance*, we need not determine whether the Restatement (Third)'s push to simplify the analysis of these doctrines controls here, because California courts have long recognized that "[a]n irrevocable license . . . is for all intents and purposes the equivalent of an easement." (*Barnes v. Hussa* (2006) 136 CalApp.4th 1358, 1370; accord, *Shoen, supra*, 33 Cal.App.5th at p. 1120 ["such licenses are functionally indistinguishable from easements"]; cf. *Eastman v. Piper*, *supra*, 68 Cal.App. at p. 562 ["as the qualities of inheritability and assignability are inconsistent with a license, we must conclude that something more than a license was intended to be granted; that it was intended to create an inheritable interest in a servient estate— in short, an easement"].) As one commentator has explained, "[t]he term 'irrevocable license' is a contradiction in terms, given the traditional definition of a license in land. Functionally, an irrevocable license does not differ at all from an easement. The only distinction is that the irrevocable license, if oral, might be invalidated from taking effect as an easement by the Statute of Frauds. . . . Analysis of the problem would be much improved if courts would drop the misnomer 'irrevocable license,' and instead assume that the parties intended to create an easement having a

15

duration longer than at the granter's will." (Smith, Neighboring Property Owners, *supra*, § 7.2; see also 4 Powell on Real Property (2019) Easements and Licenses, § 34.24 [declaring that an "irrevocable relationship should no longer be called a license, but rather an easement"]; Conard, *An Analysis of Licenses in Land* (1942) 42 Colum. L.Rev. 809, 820 ["[w]hen the parties have so acted that an unwritten license becomes irrevocable, an easement has arisen"].)

Easements, of course, are likewise unenforceable against a subsequent purchaser without notice (except in limited circumstances not applicable here).[9] (See *Mesmer v. Uharriet, supra*, 174 Cal. at p. 116; *Pollard v. Rebman* (1912) 162 Cal. 633, 634.) Accordingly, when an easement or other use is not visible and does not provide actual notice to the purchaser, it must be recorded to be enforceable. (See Civ. Code, §§ 1213, 1214.) ""The recording statutes operate to protect the expectations of the grantee and secure to him the full benefit of the exchange for which he bargained."" (*Citizens for Covenant Compliance, supra*, 12 Cal.4th at pp. 358-359.)[10] Soroudi persuasively argues it would make no sense to conclude that a document evidencing an irrevocable license need not comply with the recording acts, when another creating an easement that conveys an actual interest in land must do so. (See

---

[9] See Restatement Third of Property, Servitudes. section 7:14 and comment b (discussing prescriptive easements and those that provide necessary access or utilities to landlocked land).

[10] As discussed, neither Soroudi nor Gamerberg knew of the parking affidavit when he bought his property. Just as Gamerberg knew he was purchasing a property with limited parking, Soroudi understood the parking spaces on his property were free and clear of encumbrances.

Smith, Neighboring Property Owners, *supra*, § 7:2 [an irrevocable license is "a residuary category" for "failed easements"].)

        c. *LADBS's failure to require recording of the 1950 parking affidavit and its present belief the parking affidavit was binding on subsequent purchasers are irrelevant*

California's recording statutes, Civil Code section 1213 et seq., were enacted in 1872 and establish a reliable system by which the expectations of buyers and sellers of property can be vindicated. Certainly, the lawyers for the City of Los Angeles should have been fully cognizant of the requirements of the recording statutes in 1950 and understood that "[a]n unrecorded instrument is valid as between the parties thereto and those who have notice thereof" (Civ. Code, § 1217), but not against anyone else.[11]

Thus, it is doubtful the City's lawyers reviewed the 1950 parking affidavit for form, even though it is virtually certain the parking affidavit was intended by LADBS, as well as its signatories, to create an interest running with the land, that is, a covenant or easement that would be assignable and binding on subsequent purchasers as long as the building stood. The current version of the parking affidavit, which is required to be recorded and supported by consideration, creates a covenant that "shall

---

[11]    We reject Gamerberg's argument the existence of the parking affidavit in the LADBS files provided adequate notice to Soroudi. (See *Field-Escandon v. DeMann* (1988) 204 Cal.App.3d 228, 236-237 ["[t]he existence of the permit in the public records of a governmental agency does not have the same presumptive effect of actual knowledge as recorded documents of title to real property, where the act of recording imparts constructive notice of the contents of the instrument"].)

17

run with both the covenantor(s) and covenantee(s) above described land, shall be binding upon the covenantor, the covenantor's future owners, encumbrances, and their successors, heirs, or assignees for the benefit of the covenantee and the covenantee's future owners, encumbrances, and their successors, heirs, or assignees and shall continue in effect until the Superintendent of Building in the City of Los Angeles determines the offsite parking spaces covered by this covenant is no longer required by law."  (LADBS "Covenant and Agreement Regarding Maintenance of Off-Site Parking Space," retrieved at <http://ladbs.org/docs/default-source/forms/plan-check-2014/covenant-and-agreement-regarding-maintenance-of-off-site-parking-space-pc-str-aff27-2014.pdf?sfvrsn=15> [as of Jan. 21, 2020], archived at <https://perma.cc/WTC8-Y7Q3>.)

In light of the absence of any reference to assignees in the 1950 parking affidavit and the failure of the original signatories to record it, the testimony of the LADBS supervisor that the affidavit remained enforceable can best be understood as a comment on the Department's current practices, which has no relevance to the question in this case.  But whatever the supervisor meant, as a non-lawyer, he was not qualified to provide legal advice and appears to have unintentionally misled Gamerberg on the survivability of the unrecorded parking affidavit.  That mistake, however unfortunate, does not alter our conclusion.

## DISPOSITION

The judgment is reversed, and the matter is remanded to the superior court for entry of judgment in favor of 3000 E. 11th St., LLC.  3000 E. 11th St., LLC is to recover its costs on appeal.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.

19