Filed 12/19/13  El-Attar v. Hollywood Presbyterian Med. Center CA2/4
Opinion following remand from Supreme Court
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| OSAMAH A. EL-ATTAR, | B209056 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles Country Super. Ct. No. BS105623) |
| HOLLYWOOD PRESBYTERIAN MEDICAL CENTER, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles Country, Mary Ann Murphy, Judge.  Affirmed.

Lurie, Zepeda, Schmalz & Hogan, Kurt L. Schmalz for Plaintiff and Appellant.

Horvitz & Levy, David S. Ettinger and H. Thomas Watson; Christensen & Auer, Jay D. Christensen and Anna M. Suda, for Defendant and Respondent.

_____

Appellant Osamah El-Attar, a cardiologist, was denied reappointment to the medical staff of respondent Hollywood Presbyterian Medical Center, a private hospital (sometimes referred to here as "the hospital"). His appeal from the trial court's judgment denying his petition to set aside respondent's decision is before us for the second time. In our previous opinion, we reversed the judgment on the sole ground that respondent's selection of a hearing officer and panel to hear appellant's case violated the medical staff bylaws. The Supreme Court granted review and reversed, concluding the violation was not material. It remanded the case to us to consider appellant's remaining claims. Appellant argues that he was denied a fair peer review hearing and that respondent's decision is not supported by substantial evidence. We do not agree, and affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

In the summer of 2002, a survey team from the federal Centers for Medicare and Medicaid Services investigated complaints about respondent's peer review process. The resulting report of deficiencies identified problems with peer review and quality assurance that needed to be corrected to avoid respondent's removal from the Medicare and Medi-Cal programs. Respondent's Governing Board formed an Ad Hoc Committee (AHC) to oversee the corrective action. In addition to conducting an internal audit, the AHC engaged two outside auditors, National Medical Audit (NMA) and Steven Hirsch and Associates (Hirsch). The Medical Executive Committee (MEC), of which appellant was a member, disagreed with the Governing Board's approach.

In the fall of 2002, the internal audit identified appellant as one of a group of specialists who appeared to refer emergency room patients for unnecessary consultations. The outside auditors then performed focused reviews of physicians identified in the internal audit, including appellant. As to appellant, NMA reviewed 13 medical files, involving 17 admissions, and found four categories of problems: unacceptable care, overuse of services, substandard documentation and inadequate initial evaluation, and patient relationship issues. The Hirsch review of 30 of appellant's files found evidence

of behavioral problems (such as loss of temper and use of abusive language); substandard care and documentation; and unjustified use of risky, painful, and costly procedures (such as cardiac catheterization).[1]

Based on these reviews, in January 2003, the AHC recommended that appellant's staff privileges be suspended and his pending application for reappointment denied. The MEC declined to take action against appellant or to ratify his summary suspension. The Governing Board then voted to deny reappointment and to continue appellant's privileges for up to six months. Appellant requested a peer review hearing under the medical staff bylaws. On March 12, 2003, the MEC voted to leave the procedural actions related to the hearing to the Governing Board. As a result, the AHC, instead of the MEC, issued the notice of charges against appellant, selected a hearing officer, and appointed six panel members to the Judicial Review Committee (JRC) that was to hear appellant's case.[2]

The notice of charges against appellant alleged that he demonstrated a pattern of dangerous, unacceptable, substandard medical practice and inadequate, substandard documentation; overused hospital services; and engaged in inappropriate interpersonal relations with patients, their families, and staff. It also alleged that he failed to obtain patients' informed consent for procedures and that his abusive treatment of patients and staff had been the subject of an earlier investigation.

The peer review hearing began in May 2003 with a voir dire of the hearing officer and panel members. Before any evidence was taken, one panel member was excused, two resigned, and two new members were appointed in their place, bringing the number of panel members to five. In January 2005, after more than 20 hearing sessions, one of the panel members resigned for personal reasons, leaving the JRC with only four

---

[1] The NMA report stated respondent "pre-selected" the medical files for a focused review. A witness for respondent testified at the peer review hearing that the patient files were randomly selected.

[2] Appellant's 2003 petition for writ of mandate, challenging the Governing Board's authority under the bylaws to select the hearing officer and JRC members, was denied.

3

members.  The hearing officer overruled appellant's objection that proceeding with only four panel members violated the bylaws.  The evidentiary proceedings closed in July 2005, after approximately 30 sessions over two years.

When the JRC met to deliberate in August 2005, its chair, Dr. Mynatt, announced he could not participate because his medical group was contemplating litigation against respondent's owner, Tenet Health System QA, Inc. (Tenet), which he believed would create a conflict of interest.  The remaining three members declined to deliberate without him.  After further consultation with his attorney, Dr. Mynatt determined he did not in fact have a conflict of interest since Tenet no longer owned the hospital.  The other three members agreed to resume deliberations, and the panel was reconstituted.

In its October 2005 decision, the JRC upheld three of the six charges against appellant, concluding that he demonstrated a pattern of dangerous, unacceptable, substandard medical practice; provided inadequate, substandard medical record documentation; and had inappropriate interpersonal relations with staff.  The JRC concluded the Governing Board's decision to deny appellant's application for reappointment was "reasonable and warranted,"  although the JRC "would have pursued an intermediate resolution" had it made the initial decision.  After reviewing the record of the JRC hearing, an appeal board concluded that appellant received a fair hearing and the JRC's decision was supported by substantial evidence.  On the appeal board's recommendation, the Governing Board upheld the JRC's decision and in August 2006 terminated appellant's medical staff membership and clinical privileges.

Appellant filed a petition for writ of administrative mandate.  (Code Civ. Proc., § 1094.5)  The trial court granted his motions to conduct discovery into Dr. Mynatt's alleged conflict of interest that caused his recusal in 2005, and the administrative record was augmented with statements by the hearing officer and Dr. Mynatt in response to the court's discovery orders.  Over respondent's objection, the court also allowed appellant to augment the record with a complaint Tenet had filed against him in June 2003.  The court issued a detailed statement of decision, finding that appellant received a fair hearing, and

4

that respondent's decision was supported by substantial evidence. Appellant's writ petition was denied.

On appeal, appellant argued he was denied a fair hearing because respondent violated the medical staff bylaws by allowing the Governing Board to select the hearing officer and JRC members and by not providing appellant with proper notice of the charges against him. Appellant argued the hearing officer violated the bylaws by limiting voir dire, overruling appellant's objections to JRC members with economic ties to respondent, allowing the hearing to proceed with a four-member panel, reconstituting the panel after it disbanded, allowing Dr. Mynatt to return to the panel after he recused himself, and not allowing appellant to voir dire the re-empanelled members. Appellant also contended respondent's decision was not supported by substantial evidence.

In our previous opinion, we concluded appellant was given adequate notice of the charges against him, but we reversed the trial court's judgment because the Governing Board's selection of the hearing officer and JRC members violated the bylaws and did not comport with fair procedure. We contrasted that violation with the immaterial violation of the requirement in the bylaws that the JRC panel consist of at least five members. The Supreme Court granted appellant's petition for review and reversed our judgment, holding that the Governing Board's selection of the hearing officer and JRC members did not by itself deprive appellant of a fair hearing. The court remanded the case to us to consider appellant's remaining claims. (*El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 997 (*El-Attar*).)

On remand, the parties filed supplemental briefs. (Cal. Rules of Court, rule 8.200(b).)

## DISCUSSION

### I

We begin with a brief overview of the procedural requirements that apply to respondent's decision. Hospital peer review proceedings are governed by a statutory scheme that guarantees physicians at least minimum procedural protections. (Bus. &

5

Prof. Code, §§ 809–809.8.)[3]  Medical staff bylaws may provide additional protections, so long as they are consistent with the statutory scheme.  (*El-Attar*, *supra*, 56 Cal.4th at pp. 988–989. )  The medical staff has the primary role in the peer review process, but a hospital's administrative governing body may take disciplinary action against a physician when the medical staff's refusal to do so is against the weight of the evidence.  (*Id*. at pp. 992–993, citing § 809.05.)

Respondent's medical staff bylaws envision the MEC as the body making the initial adverse recommendation, constituting the JRC, and persuading the panel by preponderance of the evidence that its recommendation is reasonable and warranted. (Queen of Angels-Hollywood Presbyterian Medical Center Medical Staff Bylaws, art. VIII, §§ A(1)(a), C(8) & (11)(g)(3) (Bylaws).)  The Governing Board then renders the final decision, affirming the JRC's decision if it "is supported by substantial evidence, following a fair procedure."  (Bylaws, art. VIII, § C(12)(f)(1).)  When an appeal is taken, the Governing Board may appoint an appeal board to conduct an appellate hearing and issue a recommendation to the Governing Board.  (Bylaws, art. VIII, § C(12)(d) & (e).)

In this case, because the MEC refused to take action against appellant, the Governing Board took the initial adverse action against him based on the audit results, under section 809.05, subdivision (c).  (See *El-Attar*, *supra*, 56 Cal.4th at p. 993 ["although the governing body must give deference to the determinations of the medical staff, it may take unilateral action if warranted"].)  The Governing Board 's initial recommendation was affirmed by the JRC, whose decision was in turn affirmed by the appeal board and approved by the Governing Board.  The final decision is subject to judicial review by administrative mandate under Code of Civil Procedure section 1094.5. (See § 809.8; *Ellison v. Sequoia Health Services* (2010) 183 Cal.App.4th 1486, 1495.) Whether respondent followed a fair procedure is an issue of law, subject to independent review based on the administrative record.  (*Id.* at p. 1496.)

---

[3] Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

6

As a preliminary matter, we resolve the parties' disagreement about the fair procedure issues that remain to be decided in this case. Appellant claims that since the Supreme Court "reluctantly" accepted the finding that the MEC "delegated" to the Governing Board its power to select the hearing officer and JRC members, we should reconsider that finding. The Supreme Court acknowledged that the minutes from the MEC's March 12, 2003 meeting constituted substantial evidence of delegation and stated that "we must accept the trial court's finding that the MEC did, in fact, delegate its power of appointment to the Governing Board." (*El-Attar*, *supra*, 56 Cal.4th at p. 989.) Under the law of the case doctrine, we cannot reconsider a conclusion on which the Supreme Court's decision was based. (See *Roden v. AmerisourceBergen Corp.* (2007) 155 Cal.App.4th 1548, 1576 [when "'an appellate court states in its opinion a principle of law necessary to the decision, that principle becomes law of the case and must be adhered to in all subsequent proceedings, including appeals'"].)

In our previous opinion, we noted that the trial court denied appellant's request to depose two MEC members, who he claimed had told him that no vote was taken at the March 12, 2003 meeting, despite the contrary record in the minutes. We do not consider appellant's renewed conclusory claim that the court erred in denying the discovery request. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [conclusory presentation forfeits issue on appeal].) Even were we to consider it, we would find no abuse of discretion since, as the trial court noted, the declarations by the MEC members stated only that the MEC was told a vote was unnecessary, not that a vote was not taken. (See *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 992 [discovery orders are reviewed for abuse of discretion].)

Our previous opinion concluded that appellant received adequate notice of the charges against him since the amended charges included detailed allegations supported by specific medical records, summaries of incidents, and references to the outside audit reports that identified problems in individual patient cases. (See *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 623–624 [notice adequate if act or omission tied to patient chart].) Unlike the physician in *Rosenblit v. Superior Court*

7

(1991) 231 Cal.App.3d 1434, 1446 (*Rosenblit*), appellant was not left to mine through the medical records to identify the deficiencies with which he was charged as to each patient.

Our original determination that notice was adequate was intended to guide the parties on remand. (See *Lucky United Properties Investments, Inc. v. Lee* (2013) 213 Cal.App.4th 635, 645 [law of the case applies to issues decided in order to provide guidance on remand].) Appellant urges us to reconsider it. We see no reason to do so. The Supreme Court did not take issue with that portion of our opinion, and it remanded the case to us to consider claims we had found unnecessary to reach before. (*El-Attar*, *supra*, 56 Cal.4th at p. 997.) Appellant provides no new authority requiring us to reach a different conclusion on the adequacy of the notice of charges against him.

Appellant acknowledges that our previous opinion suggested the decision to proceed with four JRC members, when the Bylaws (art. VIII, § C(8)) required five,[4] may be an immaterial violation. Indeed, appellant fails to explain how the number of panel members was prejudicial or unfair if the JRC rendered a unanimous decision. The Supreme Court suggested that immaterial violations of the bylaws may be relevant evidence of bad intent. (See *El-Attar*, *supra*, 56 Cal.4th at p. 997.) Appellant now urges us to consider the cumulative effect of that violation in the context of other alleged violations.

The hearing officer has discretion over procedural matters, efficiency and expediency. (Bylaws, art. VIII, § C(11)(c).) We see efficiency and expediency, rather than bad intent, in the hearing officer's decision to proceed with four members when the fifth member resigned for personal reasons after more than 20 hearing sessions in over a year. A total of eight members had been appointed to the JRC to allow for a safety margin, and the chance reduction of their number to four, mostly through resignation and without any suggestion of improper involvement on respondent's part, is both immaterial and irrelevant. We see no reason to consider this issue further.

---

[4] Sometime during the proceeding, the medical staff bylaws were amended to require only three JRC members.

Appellant's remaining fair procedure claims concern the hearing officer's decisions on the perceived bias of the four JRC members, and particularly of the JRC's chair, Dr. Mynatt. We examine these claims next.

*A. Financial Interest as Evidence of Bias*

A physician at a private hospital has fair procedure rights arising "from section 809 et seq. and not from the due process clauses of the state and federal Constitutions. [Fn. omitted.]" (*Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 102.) Under the statute, a physician is entitled to a hearing before "a panel of unbiased individuals who shall gain no direct financial benefit from the outcome, who have not acted as an accuser, investigator, factfinder, or initial decisionmaker in the same matter, and which shall include, where feasible, an individual practicing the same specialty." (§ 809.2, subd. (a).) The Bylaws (art. VIII, § C(8)) contain similar requirements, providing further that, if feasible, the JRC must be composed of members of the active medical staff. Appellant argues that the hearing officer incorrectly ignored the JRC members' substantial financial ties to respondent only because they did not derive a direct financial benefit from the outcome of the hearing.

Disqualification of a member of a review panel is appropriate if there is "actual bias," or if "a situation exists under which human experience teaches that the probability of actual bias is too high to be constitutionally tolerable." (*Lasko v. Valley Presbyterian Hospital* (1986) 180 Cal.App.3d 519, 529 (*Lasko*).) Actual bias need not be demonstrated when a decision-maker has a financial interest; in such cases, "an objective, intolerably high risk of actual bias will suffice." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 216 (*Today's Fresh Start*).) A high risk of actual bias has been found where a decision-maker has a direct personal or institutional financial interest in the outcome of a case. (*Id.* at pp. 216–217.) That is the standard provided for in the statute and medical staff bylaws.

Appellant cites *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017 (*Haas*) and *Yaqub v. Salinas Valley Memorial Healthcare System* (2004) 122 Cal.App.4th 474 (*Yaqub*) for the proposition that, to be disqualifying, a financial interest need not be a

9

direct interest in the outcome of the case. In *Haas*, the court condemned a county's unilateral ad hoc selection and payment of hearing officers on the ground that they gave officers "an impermissible financial interest in the outcome of the cases they are appointed to decide, because the officers' prospects for obtaining future ad hoc appointments depend solely on the county's goodwill and because the county, in making such appointments, may prefer those officers whose past decisions have favored the county." (*Id*. at p. 1020.)

*Yaqub*, *supra*, 122 Cal.App.4th 474 extended the *Haas* holding to the revocation of a physician's hospital privileges through a peer review proceeding. The hearing officer in *Yaqub* was unilaterally selected by the hospital. He had served as a mediator, arbitrator, and hearing officer in cases involving the hospital, including the physician's suspension hearing, and could potentially be appointed to preside over other hearings in the future. (*Id*. at pp. 484, 485.) The *Yaqub* court acknowledged that these facts brought the hearing officer's appointment "within the ambit of *Haas*." (*Id*. at p. 484.) But it also suggested there was no evidence "of a direct financial interest in the outcome of the case." (*Id*. at p. 485) That suggestion was inconsistent with *Haas* where the court expressly concluded that the appointment and payment procedure, implicitly offering the possibility of future employment as an adjudicator in exchange for favorable decisions, created "an impermissible financial interest in the outcome of the cases . . . ." (*Haas*, *supra*, 27 Cal.4th at p. 1020.)

The court in *Yaqub*, *supra*, 122 Cal.App.4th 474 also noted that the hearing officer previously had served on the board of governors of a foundation that raised funds for the hospital, and that the board of governors was elected by the hospital's board of directors. (*Id*. at p. 484.) It is doubtful that, by themselves, these facts would have brought *Yaqub* within the scope of *Haas* since *Haas* held only that "an adjudicator whose future work in that capacity depends entirely on the goodwill of the party paying the adjudicator's fee" had a "direct, personal, and substantial" financial interest. (*Haas*, *supra*, 27 Cal.4th at p. 1032.) The *Haas* court expressly distinguished "speculative claims of financial interest," such as the one rejected in *Gai v. City of Selma* (1998) 68 Cal.App.4th 213,

228, where the sale of gasoline to a city by a member of the city personnel commission was unrelated to the disciplinary matter before the commission. (See *Haas*, at p. 1032.) Thus, *Haas* and *Yaqub* do not stand for the broad proposition that a decision-maker's financial ties to a party in the proceeding is per se disqualifying.

Here, three of the four JRC members were active members of respondent's medical staff. Each practiced within a medical group that contracted with more than one hospital. Dr. Lev was head of respondent's neonatology intensive care unit. Dr. Mynatt was an orthopedic surgeon, 80 percent of whose practice was at the hospital, as was most of Dr. Triantafyllos' radiation oncology practice. Appellant objected that these three members' substantial ties to respondent constituted disqualifying financial interests.

By definition, members of a hospital's medical staff are contracted to provide services at the hospital. (See § 805, subd. (a)(4) ["'Staff privileges' means any arrangement under which a licentiate is allowed to practice in or provide care for patients in a health facility. Those arrangements shall include, but are not limited to, full staff privileges, active staff privileges . . . , and contractual arrangements to provide professional services. . . ."].) Appellant's objection that the active medical staff members were disqualified, in essence, by their staff privileges is exceedingly broad and would have required the general disqualification of active medical staff members in contravention of the medical staff bylaws, which allowed their service on the JRC, provided they had not participated in the case and had no direct financial interest in its outcome. (Bylaws, art. VIII, § C(8).)

Dr. Getzen, the fourth JRC member, was the only cardiologist on the panel. He was not a member of respondent's medical staff, and appellant, somewhat inconsistently, objected to him on that basis. First Dr. Getzen and then, through the course of the protracted proceeding, all JRC members were compensated for their services at fixed rates and "without regard to the outcome of the hearing." There is no evidence that the appointment of active staff members to the JRC or the compensation of panel members held the potential of their future work as *adjudicators* if they rendered a decision favorable to respondent in this case. To the contrary, their compensation was expressly

11

not tied to the outcome of the case. Neither *Haas*, nor *Yaqub* may be read as supporting disqualification under the circumstances presented in this case.

### B. *Dr. Mynatt's Additional Conflicts of Interest*

Appellant raises additional fair procedure claims as to Dr. Mynatt's perceived conflicts of interest stemming from the economic relationship between the Arthritis Institute, the medical group of which Dr. Mynatt was a member, and respondent's one-time owner, Tenet. Specifically, appellant claims that, during the pendency of the JRC proceeding, he was evicted from his office to make room for the Arthritis Institute, and the Arthritis Institute contemplated suing Tenet. We address appellant's claims in turn.

### 1. *Voir Dire*

Appellant argues the hearing officer improperly limited the questioning of Dr. Mynatt about his economic relationship with Tenet. Under both state law and the Bylaws (art. VIII, § C(11)(a)(5)), appellant had the right to "a reasonable opportunity" to voir dire the panel members. (§ 809.2, subd. (c); see *Lasko*, *supra*, 180 Cal.App.3d at p. 530 [doctor was deprived of fair procedure when he was given no opportunity to question members of hospital's hearing committee about possible bias].) He was afforded that opportunity during the voir dire in May 2003.

Dr. Mynatt testified he practiced independently under the umbrella of the Arthritis Institute, a medical group that had 15 other members. According to Dr. Mynatt, the Arthritis Institute was "a joint program" with Tenet, which at the time owned the hospital and provided the Arthritis Institute's members with office space. Dr. Mynatt did not know whether the Arthritis Institute was a partnership or a corporation, and he thought he was not qualified to answer whether the joint program with Tenet qualified as a "joint venture." At one point during this portion of the voir dire, Dr. Mynatt told appellant's counsel, "You just made a statement. Would you like to ask me a question?" At another, he quipped, "Asked and answered." These comments caused counsel to argue that he did not need to ask any more questions because Dr. Mynatt was uncooperative and would not be impartial. The hearing officer disagreed, concluding Dr. Mynatt had answered

12

counsel's question about his understanding of the relationship between the Arthritis Institute and Tenet.

The voir dire resumed, and Dr. Mynatt testified that the Arthritis Institute did not pay for office space, nor did Tenet compensate its members for any services they provided, other than funding research at one of the Arthritis Institute's other locations. At the end of the voir dire, appellant's attorney suggested Dr. Mynatt would not be impartial because he was "involved in a program in which Tenet is the . . . joint partner." The hearing officer sustained respondent's objection that Tenet was not a party to the proceeding.

The record does not support appellant's claim that the hearing officer improperly limited the voir dire. To the contrary, the hearing officer intervened at a point when appellant's attorney wanted to end the voir dire prematurely. The attorney resumed Dr. Mynatt's voir dire after the hearing officer's intervention, and ended it on his own accord after eliciting further answers from Dr. Mynatt. There is no support for appellant's speculative suggestion that Dr. Mynatt's answers were "evasive," or that he knew more about the relationship between the Arthritis Institute and Tenet than he disclosed. Nor was Dr. Mynatt the only panel member who had difficulty answering this line of questions. Dr. Triantafyllos also stated he did not completely understand the nature of his medical group's contract with respondent.

### 2. *Exclusion of Evidence*

Appellant argues the hearing officer excluded evidence of appellant's eviction from a nearby medical office building to make room for the Arthritis Institute. The argument is based on the exclusion of five exhibits, which were offered in September 2003 as evidence of the Governing Board's retaliation against appellant. The excluded exhibits consist of appellant's month-to-month lease with Hollywood Presbyterian Medical Office Building I (HPMOB); two 30-day notices to terminate, dated November 2002 and May 2003; HPMOB's June 2003 unlawful detainer complaint against appellant; and a floor plan. Although appellant's counsel stated that Tenet wanted to "move or expand the Arthritis Clinic," none of the proffered exhibits mentioned the Arthritis

13

Institute. Nor did appellant's counsel purport to offer those exhibits as evidence of Dr. Mynatt's conflict of interest, and we have been cited to no place in the record of the JRC hearing where appellant argued that his eviction was evidence of Dr. Mynatt's bias.

Appellant cites to the complaint for intentional interference with a prospective economic advantage that Tenet filed against him in June 2003. The complaint alleged Tenet had acquired an option to lease suites in the building where appellant's office was located and sought to exercise that option to "establish an Arthirtis Institute to serve the needs of the community." It also alleged appellant's refusal to vacate his office resulted in "lost profits from the operation of the Arthritis Institute."

The complaint was not included among the exhibits proffered at the JRC hearing. The trial court originally took judicial notice of it, and of our decision on appellant's cross-complaint against Tenet, in the context of respondent's argument that appellant was collaterally estopped from alleging retaliation. (See *El-Attar v. Tenet HealthSystem QA, Inc.*, July 19, 2006, No. B182251 [nonpub. opn.].)[5] Appellant in turn, for the first time, argued that Tenet's lawsuit against him benefitted Dr. Mynatt, who had a "business venture" with Tenet, and that the hearing officer should have required a full disclosure of that venture.

At the hearing on the petition, appellant persuaded the court to admit the Tenet complaint against him into evidence because respondent had cited to the complaint, and the court had agreed to take judicial notice of that pleading. Respondent objected that it had referenced the lawsuit as part of its legal argument on collateral estoppel, rather than as evidence. Although respondent does not renew its objection on appeal, it is questionable whether the belated inclusion of the Tenet complaint in the administrative record was justified. The complaint could have been but was not offered into evidence at

---

[5] In *El-Attar v. Tenet HealthSystem QA, Inc.*, *supra*, we found insufficient evidence that appellant had been retaliated against because of his criticism of hospital practices, or because of the petition for removal of respondent's chief executive officer which appellant, along with other medical staff members, circulated in the fall of 2002. The petition and a summary of appellant's complaints about hospital practices were among the exhibits excluded at the JRC hearing.

14

the JRC hearing.  (See Code Civ. Pro., § 1094.5, subd. (e) [court may admit improperly excluded evidence or evidence that could not have been produced through reasonable diligence during administrative hearing].)  Any claim that the hearing officer should have required full disclosure of Dr. Mynatt's potential bias based on appellant's eviction from his office was forfeited because appellant did not raise the issue during the JRC hearing. (See *Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 892 fn. 6.)

On its merits, appellant's claim that Tenet's lawsuit against him is evidence of Dr. Mynatt's bias is tenuous at best.  There is no evidence that Dr. Mynatt would have directly benefitted from appellant's loss of his privileges at the hospital, which was unrelated to appellant's eviction under a lease with another entity.  Moreover, appellant's assumption that Dr. Mynatt was "Tenet's joint venturer in the Arthritis Institute," and thus a beneficiary of Tenet's lawsuit against appellant for lost profits, is speculative. Neither Dr. Mynatt's testimony during the May 2003 voir dire, nor the Tenet complaint indicates the existence of a joint venture between Dr. Mynatt and Tenet.  Contrary to appellant's contention, the trial court made no such finding.

There also is no evidence Dr. Mynatt himself competed with appellant for office space.  (See *Today's Fresh Start*, *supra*, 57 Cal.4th at pp. 216–217 [business competitor cannot be adjudicator].)  Nor is there any indication that the Arthritis Institute or Dr. Mynatt was directly involved in Tenet's lawsuit against appellant or had any notice of it.  (See *Lasko*, *supra*, 180 Cal.App.3d at p. 529 [decision-maker may not be "enmeshed in other matters involving the person whose rights he is determining"]; see e.g. *Johnson v. Mississippi* (1971) 403 U.S. 212, 215 [judge against whom criminal defendant had won civil rights case immediately prior to adjudication of contempt was "so enmeshed" in matters involving defendant as to merit disqualification for bias].)

To sum up, since appellant did not raise the relevance of his eviction to the issue of Dr. Mynatt's bias at the JRC hearing, he may not now be heard to complain that he was not given an opportunity to voir dire Dr. Mynatt about it, and it would be speculative to conclude on this record that any additional voir dire would have revealed facts requiring Dr. Mynatt's disqualification.

*3. Recusal*

In mid-August 2005, the hearing officer sent out a letter advising the parties that, at the outset of deliberations, Dr. Mynatt had recused himself because "he could not be certain that he would not be biased against Tenet . . . in light of a recently developed conflict of interest and adversarial relationship with that entity." The remaining three members declined to deliberate in Dr. Mynatt's absence. Ten days later, the hearing officer advised that all JRC members had "reexamined their prior positions" and were willing to deliberate. The hearing officer believed "it would be an injustice to all concerned" to abort the JRC proceeding short of a decision. In response to appellant's concerns about Dr. Mynatt's change of position, the hearing officer stated only that all JRC members had told him they were unbiased. He did not explain how Dr. Mynatt had cleared his alleged conflict of interest and did nothing to allay appellant's express concern that Dr. Mynatt had been pressured or induced to change his position.

The trial court granted appellant's discovery request and augmented the record with statements by the hearing officer and Dr. Mynatt. According to the hearing officer's statement, Dr. Mynatt had recused himself because his medical group was contemplating litigation stemming from its contractual relationship with Tenet. Dr. Mynatt was later advised by counsel that Tenet no longer owned the hospital, which meant that the potential litigation against Tenet was not against respondent's current owner. In his statement, Dr. Mynatt advised that his return to the JRC was "absolutely not" the result of any contact or influence by Tenet, and that Tenet did not offer anything in connection with any costs or damages arising out of his participation in the JRC proceeding. Dr. Mynatt also stated that since Tenet resolved its outstanding balance to the Arthritis Institute, "there was no litigation."

Appellant argues the reconstitution of the panel after Dr. Mynatt's recusal violated fair procedure because the hearing officer conducted what amounted to a secret voir dire with the returning panel members. (See *Rosenblit*, *supra*, 231 Cal.App.3d at pp. 1448–1449 [secret voir dire of panel members deprived physician of fair procedure where panel included members with potential conflicts of interest].) We agree that the hearing officer

16

should have followed up on appellant's request for an explanation about Dr. Mynatt's change of position. But the error did not prejudice appellant because the evidence produced in response to his discovery motion does not indicate that additional voir dire would have exposed "facts that would require disqualification of individuals on the panel." (*Hackethal v. Cal. Medical Ass'n.* (1982) 138 Cal.App.3d 435, 443.)

"""Bias and prejudice are not implied and must be clearly established. A party's unilateral perception of bias cannot alone service as a basis for disqualification. Prejudice must be shown against a particular party and it must be significant enough to impair the adjudicator's impartiality. The challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice.""" (*Linney v. Turpen* (1996) 42 Cal.App.4th 763, 773.) Appellant's insistence that Dr. Mynatt may have been pressured or induced to return to the panel does not demonstrate bias because it is speculative and contrary to the evidence produced in the trial court.

Appellant asks that we take judicial notice of the statement of interested persons respondent filed in the Supreme Court, which lists Tenet as respondent's owner "at the time of the events being litigated." Even were we to take judicial notice of the existence of that document in the court file, we may not take judicial notice of the truth of any hearsay statements it contains. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564.) Appellant also claims the trial court incorrectly denied his request for discovery of Tenet's obligation to indemnify respondent's new owner for any liability arising out of the proceedings against appellant. This conclusory claim, raised for the first time in the reply brief, is forfeited. (See *Benach v. County of Los Angeles*, *supra*, 149 Cal.App.4th at p. 852; *Cold Creek Compost, Inc. v. State Farm Fire & Casualty Co.* (2007) 156 Cal.App.4th 1469, 1486.) Moreover, any continuing interest Tenet may have in this case is relevant only to Dr. Mynatt's concern that he might be biased against Tenet. That subjective concern does not establish "an objective, intolerably high risk of actual bias" against appellant. (See *Today's Fresh Start*, *supra*, 57 Cal.4th at p. 216; *Linney v. Turpen*, *supra*, 42 Cal.App.4th at p. 773.)

Appellant also contends Dr. Mynatt should not have been allowed to return to the panel after recusing himself. Appellant cites *Geldermann, Inc. v. Bruner* (1991) 229 Cal.App.3d 662, where a trial judge filed a statement of decision and a judgment after recusing himself, in violation of the procedural requirements of the judicial disqualification statutes. (*Id*. at p. 666, citing Code Civ. Pro., §§ 170.3 & 170.4.) The application of these statutes to administrative proceedings has been rejected because "to do so would obliterate the distinction between judicial and administrative proceedings carefully articulated by the courts for due process purposes." (*Gai v. City of Selma*, *supra*, 68 Cal.App.4th at pp. 232–233; see also Code Civ. Proc., § 170.5, subd. (a) ["'Judge' means judges of the superior courts, and court commissioners and referees"].) Appellant relies on dictum in *Yaqub*, *supra*, 122 Cal.App.4th 474, 486 that "[p]rinciples applicable to judicial officers in court proceedings provide comparable guidance" to the discussion of bias in an administrative proceeding in *Haas*, *supra*, 27 Cal.4th 1017. The dictum is not authority for engrafting the procedural requirements of the judicial disqualification statutes onto administrative or hospital peer review proceedings.

Moreover, since a violation of the judicial disqualification statutes does not necessarily violate due process, it cannot be said to violate fair procedure. In *People v. Freeman* (2010) 47 Cal.4th 993, the court rejected the argument that trial before a judge whose earlier recusal had been based on an unfounded appearance of bias violated the defendant's due process right to an impartial judge. The court explained that an objectively high probability of bias, rather than mere appearance, was required for a due process violation. (*Id*. at p. 1005.) Appellant characterizes Dr. Mynatt's recusal from and return to the JRC as having an "appearance of impropriety" and claims that Dr. Mynatt's "financial entanglements with the Hospital created a greater risk of unfairness" to appellant than the appearance of bias in *People v. Freeman*. As we have explained, nothing supports appellant's conjecture that Dr. Mynatt's decision to return to the panel was financially induced. Nor does Dr. Mynatt's subjective belief that he might be biased against Tenet if Tenet still owned respondent create an objective high risk of

18

unfairness towards appellant. No objective high probability of bias against appellant existed here.

In a related argument, appellant argues the hearing officer did not have authority to reconstitute the JRC after it decided to disband. He cites *Mileikowsky v. West Hills Hospital and Medical Center* (2009) 45 Cal.4th 1259 (*Mileikowsky*). There, the court held that the hearing officer was not authorized to dismiss a peer review hearing as a terminating sanction for a physician's failure to comply with discovery orders. (*Id*. at pp. 1265–1266.) The court reasoned that "by dismissing the proceedings before the hearing was convened the officer prevented the reviewing panel from considering the evidence and eliminated the reviewing panel's role in the decisionmaking process." (*Id*. at p. 1269.) Not only was the authority of the hearing officer to issue a terminating sanction not envisioned in the statutory scheme or the hospital bylaws, but the exercise of that authority contravened the goals of the statutory peer review process. The court explained that "a hearing officer who prevents the reviewing panel from conducting its review 'votes' by ensuring that the peer review committee's recommendation will be the final decision." (*Id*. at p. 1271.)

The court's decision in *Mileikowsky*, *supra*, 45 Cal.4th 1259, rested on the notion that the hearing officer's decision to terminate the proceeding effectively commandeered the panel's adjudicatory function. It does not aid appellant here, where the opposite occurred. Rather than precluding the panel from performing its function, the hearing officer exercised his authority to rule on matters of law and procedure in order to ensure that the JRC was able to issue a decision. (Bylaws, art. VIII § C(11)(c).) The hearing officer did not usurp the authority of the panel members; on the contrary, the record shows he acted in accordance with the panel's wishes. Since the hearing officer did not appoint new members to the panel or start a new proceeding, he did not usurp MEC's authority to appoint panel members under the Bylaws (art. VIII, § C(8)). There also is no indication that the hearing officer knew in advance what the panel's decision would be, and it cannot reasonably be said that by allowing the panel to reach a decision he "advocated" or "voted" for respondent in violation of section 809. 2, subdivision (b).

19

Appellant's belief that absent a JRC decision he would have retained his staff privileges, rather than be subject to another hearing, is unfounded.

We conclude that none of the procedural irregularities or deviations from the medical staff bylaws in this case was material, or evidenced bad intent. Appellant was afforded a fair hearing.

II

Appellant argues that respondent's decision is not supported by substantial evidence. "[O]ur function in this context is the same as the superior court's, which was the same as [that of] the hospital's governing body." (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1137 (*Hongsathavij*).) We consider whether the governing body applied the proper standard of review to the JRC's findings, and whether the final decision is supported by substantial evidence. (*Id.* at p. 1136.) Here, the Bylaws (art. VIII, § C(12)(f)(1)) required that the JRC's decision be reviewed for substantial evidence, and that is the standard the appeal board applied in the final decision, which the Governing Board approved. The final decision incorporated by reference the JRC's findings and concluded they were supported by substantial evidence. We must uphold that decision "unless the findings are so lacking in evidentiary support as to render them unreasonable. [Citations.]" (*Id.* at p. 1137.)

Appellant argues the JRC's findings violated fair procedure because they were stated in a conclusory fashion. He cites *Rosenblit*, *supra*, 231 Cal.App.3d 1434. There, the hearing panel concluded the physician "had not shown that his suspension based on his 'exercise of poor clinical judgment was made unreasonably, not sustained by the evidence, or unfounded. [*Sic*.]'" (*Id.* at p. 1440.) The court held that this "conclusory verdict," lacking specific findings or description of how the physician endangered his patients, was the culmination of an unfair proceeding, during which the physician "was kept in the dark about the specific charges made against him, of his asserted opportunity to obtain copies of the charts, and finally of the basis upon which the hearing panel decided the issues adversely to him." (*Id.* at pp. 1447–1448.) Since we have determined

20

that appellant had adequate notice of the charges against him and was afforded a fair hearing, *Rosenblit* is distinguishable.

To pass review in an administrative mandate proceeding, a decision must contain "legally relevant sub-conclusions" and must point out the "analytic route the administrative agency traveled from evidence to action." (*Topanga Association for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515–516, citing Code Civ. Proc., § 1094.5, subd. (b) [abuse of discretion exists when administrative decision is not supported by findings or findings are nor supported by evidence].) Findings in this context "are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein," so long as they enable the parties and the reviewing court to determine the basis for the decision. (*Sierra Club v. California Coastal Com.* (1993) 19 Cal.App.4th 547, 557.) The findings may properly incorporate matters by reference and omissions may be filled by "such relevant references as are available in the record. [Citation.]" (*Craik v. County of Santa Cruz* (2000) 81 Cal.App.4th 880, 884.)

The JRC's findings contain specific sub-conclusions regarding each charge. Although the findings are not supported with specific references to the record, peer review decisions making only global references have been affirmed, so long as the findings sufficiently apprised the parties and the court of the basis for the decision. (See, e.g., *Weinberg v. Cedars-Sinai Medical Center* (2004) 119 Cal.App.4th 1098, 1105–1106, 1112; *Gaenslen v. Board of Directors* (1985) 185 Cal.App.3d 563, 573.) That is the case here. The charges against appellant are cited in the JRC's decision and the complete first amended notice of charges is attached to the decision. The notice lists the specific medical records on which the allegations were based, and the parties agree what medical records were before the JRC. [6] The JRC's findings can be traced to the medical records and testimony with reasonable certainty.

---

[6] We designate the relevant records by appellant's case number and the patient's account (PA) number listed in the index to medical charts, on which both parties rely.

The JRC sustained the charges alleging patterns of substandard practice and documentation, and unprofessional conduct. It did not sustain the charges for overuse of hospital services and failure to inform patients about the risk of procedures. The JRC declined to make a finding on the charge that appellant had been subject to a previous investigation. We next consider whether substantial evidence supports the findings on each of the three sustained charges against appellant.

In doing so, we are guided by several well-established principles. Findings may not be supported by evidence that is inherently improbable or irrelevant to the issues, or by expert testimony "based upon conclusions or assumptions not supported by evidence in the record." (*Hongsathavij*, *supra*, 62 Cal.App.4th at p. 1137.) Additionally, an expert's opinion that does not include "a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510.) Under the substantial evidence test, "it is not the function of reviewing courts to resolve differences of medical judgment." (*Cipriotti v. Board of Directors* (1983) 147 Cal.App.3d 144, 154; see also *Bonner v. Sisters of Providence Corp.* (1987) 194 Cal.App.3d 437, 447–448 ["[c]ourts are ill-equipped to assess the judgment of qualified physicians on matters requiring advanced study and extensive training in medical specialties"].) Accordingly, we must consider the evidence in the light most favorable to respondent, giving it the benefit of every reasonable inference and resolving conflicts in support of the final decision. (*Huang v. Board of Directors* (1990) 220 Cal.App.3d 1286, 1294.)

A. *Pattern of Dangerous, Unacceptable, Substandard Practice*

Charge I states that appellant demonstrated "a pattern of dangerous, unacceptable, substandard practice" evidenced by his "failure to recognize serious medical conditions, failure to intervene as the attending physician in order to postpone a non-emergent procedure on a high risk patient, improper or inadequate diagnoses, improper clinical management of patients and/or by performing various tests, including but not limited to cardiac catheterizations without patient specific indicators or adequate documentation of

22

clinical findings to justify the necessity of the procedure." The charge alleged that his substandard practice either caused or had the potential to cause harm to patients as illustrated by a list of specific allegations about 23 medical records and one incident of unprofessional conduct. Also included in this charge were references to the NMA and Hirsch audit reports, and to charge III, which alleged appellant engaged in a pattern of substandard documentation.

The JRC found that appellant frequently relied on "test reports prepared by others—X-rays, EKGs, echocardiograms, thalium [*sic*.] stress tests—without personally reviewing the actual tests himself" and that this practice was substandard, posing "serious potential harm to patients." The JRC found that appellant failed to investigate "significant disparities between [his patients'] physical condition and reports of their tests, e.g. echocardiograms, thalium [*sic*.] stress tests, and EKGs." The JRC also found appellant's documentation frequently failed "to demonstrate patient-specific indications for tests which he ordered or performed," and was "woefully inadequate and substandard." The JRC cited appellant's "inappropriate conduct toward Hospital staff" as an additional reason for sustaining the charge of dangerous substandard practice because it had "the potential to disrupt proper patient care."

Appellant argues the JRC failed to make a finding on the allegation of dangerous practice, particularly with regard to case nos. 1 and 2. In case no. 1 (PA# 1494740), appellant was alleged to have cleared a high-risk patient for non-emergency urological surgery, after the patient developed blood in his urine as a result of pulling on his catheter. In case no. 2 (PA#1084224), appellant was alleged to have incorrectly diagnosed a preterminal patient with dehydration, to have incorrectly treated her, and to have failed to recognize a heart attack. These were the only cases in which appellant was alleged to have caused actual harm to a patient or to have hastened a patient's death, rather than just exposing the patient to risk of harm, as was alleged in other cases.

Appellant is correct that the JRC did not find he had actually harmed any patient, which indicates that it did not base its findings on the allegations in case nos. 1 and 2. But he cites no authority that a finding of substandard or dangerous practice must be

23

based on actual harm as opposed to risk of harm or inadequate care. "The primary purpose of the peer review process is to protect the health and welfare of the people of California by excluding through the peer review mechanism 'those healing arts practitioners who provide substandard care or who engage in professional misconduct.' (§ 809, subd. (a)(6).)" (*Mileikowsky*, *supra*, 45 Cal.4th at p. 1267.) A physician's privileges may be terminated for conduct "reasonably likely to be detrimental to patient safety or to the delivery of patient care." (§ 805, subd. (a)(6).) Moreover, the use of "and/or" in the allegations on this charge suggests they were stated in the alternative, so that one or more allegations could sustain the charge.

Appellant argues the JRC's findings that he frequently relied on test reports without personally reviewing the tests or investigating significant disparities between test results and the patients' physical condition were not responsive to the allegations in the charge, and deprived him of an opportunity to present a defense. This new fair procedure argument, raised for the first time in the reply brief, is untimely and may be deemed forfeited. (See *Cold Creek Compost, Inc. v. State Farm Fire & Casualty Co.*, *supra*, 156 Cal.App.4th at p. 1486.) It also is factually incorrect since discrepancies between test results, and between the patient's physical condition and test results, were present in many of the medical records at issue. They were discussed in the NMA and Hirsch audit reports and were subsumed in the broad allegations about appellant's "failure to recognize serious medical conditions, . . . improper or inadequate diagnoses, improper clinical management of patients," as well as the allegation that he performed tests without patient-specific indicators. The JRC's narrowly worded findings suggest only that charge I was sustained on a limited basis, not that it was sustained on grounds of which appellant had no notice.

Because of the JRC's limited findings, at least some of the evidence on which respondent relies appears to be irrelevant. In addition to case nos. 1 and 2, case no. 4 (PA#945030) does not fit those findings. There, appellant allegedly ordered unnecessary blood transfusions for a dehydrated 89-year-old patient with chronic medical problems, as well as multiple unnecessary consults that resulted in tests of "marginal utility" and an

24

unnecessarily long hospital stay. The JRC did not make a broad finding with regard to the allegation of improper clinical management, or any specific finding with regard to unnecessary treatment, consultations, or hospital stay, and it specifically declined to find that appellant overused hospital services, including consultations, treatments, procedures, and prolonged hospital stays.

Nonetheless, the vast majority of the remaining evidence supports the JRC's findings that appellant frequently relied on test reports without personally reviewing the actual tests or investigating the discrepancy between test results and the patient's condition, and that his documentation was substandard.

A discrepancy between x-rays existed in case no. 1, where post-operatively, an x-ray indicated that the patient's heart remained "enlarged with pulmonary congestion, unchanged since the preceding" x-ray, which, however, had been read as clear. Appellant testified that the patient's condition was good because the chest x-ray was clear. The evidence supports the JRC's finding that appellant relied on test reports prepared by others without reviewing the actual tests even though the reports contained obvious discrepancies.

In case no. 6 (PA#1112295, PA#1196782, PA#1250035, PA#1338153), appellant's illegible notes and inadequate documentation of a patient's repeat hospitalizations for abdominal pain did not make clear whether repeat abdominal tests were indicated based on the patient's history and clinical findings, which affected the continuity of patient care. Appellant's insistence that the dates on two summaries in the record were transposed through no fault of his own misses this larger issue.

Case nos. 8, 9, and 10 (PA#1680834, PA#2418903, PA#2456754) involved one patient's successive admissions. During the patient's first admission for a heart attack, appellant apparently relied on an incorrect interpretation of her cardiac rhythm even though it was his responsibility to read the EKG. On her second admission, the patient was diagnosed with mitral and aortic stenosis that, according to respondent's expert, was already present and could have been detected through physical examination or a correct reading of an echocardiogram taken during the first admission. There also was an

25

unusually gross, as opposed to the commonly minor, discrepancy between gradients on an echocardiogram and a cardiac catheterization during the second admission, and the stenosis was incorrectly reported as mild rather than severe.

Although the actual echocardiograms were not in evidence, respondent's expert did not testify that viewing them was essential to his opinion. The thrust of that opinion was that the patient's condition could and should have been diagnosed during the first admission, and that it was appellant's responsibility to review the echocardiograms in order to see whether the technician correctly interpreted them. The expert also opined that a repeat catheterization on the patient was not indicated since a recent catheterization had shown no significant coronary disease. Based on these and other irregularities, the expert's opinion was that the treatment during the first admission and the documentation during the second were below the standard of care. Also relevant to the JRC's findings was evidence of poor documentation during the third admission and a repeat echocardiogram that did not appear to be indicated by a change in the patient's condition. On the other hand, appellant's allegedly questionable decision to discontinue one of the patient's medications appears to be irrelevant to the JRC's narrow findings.

The rest of the cases reviewed by the JRC all involved cardiac catheterization, an invasive diagnostic test in which a catheter is inserted into a blood vessel and directed to the heart to allow the examination of coronary arteries through, for instance, an angiogram. Catheterization is often preceded by a non-invasive stress test, in which the coronary arteries are viewed while the patient is at rest and on a treadmill. The author of the Hirsh report, who was one of respondent's experts at the hearing, noted "[a]n unusual number of cardiac catheterization angiograms which were unremarkable or negative," but which "were preceded by reportedly positive nuclear stress testing." He recommended that "quality control mechanisms be instituted for interpretation of these thallium stress tests." The expert estimated that only seven out of 16 randomly selected catheterizations performed by appellant were justified and nine were normal or indicating low-grade disease, which, while not substandard, was "highly unusual." In light of the pattern of positive stress tests preceding unremarkable or normal catheterizations, the expert opined

26

it was incumbent upon appellant to carefully review such tests before proceeding with catheterizations. Additionally, as co-director of the catheterization laboratory, appellant was responsible for monitoring the correlation between the rates of positive stress tests and normal catheterizations.

Appellant contends that the evidence of "unnecessary catheterizations" is irrelevant since the JRC did not make such a finding. But the JRC found appellant's records "frequently failed to demonstrate patient-specific indications for tests which he ordered or performed." The finding corresponds to the allegation that he performed "tests, including . . . cardiac catheterizations without patient specific indicators or adequate documentation of clinical findings to justify the necessity of the procedure." The experts' disagreement about the necessity of catheterization in some cases goes to the credibility and weight of their opinions, matters which we do not redetermine on appeal. Appellant's often conclusory claims that the opinions of respondent's experts on the subject were not supported by the medical record or medical authority are not persuasive.

In case no. 12 (PA#883417), respondent's expert explained that an angiogram performed after a questionable stress test result showed no heart disease in a patient with abdominal pain who was later diagnosed with acute pancreatitis. The expert identified this case as one of the pattern of catheterization tests performed based on questionable stress tests. The case also was one where tests were done on minimal indications. There was no evidence the patient had complained of chest pain upon admission, and appellant's later reports that the patient had chest pain appeared aberrant. Catheterizations after questionable stress tests also were at issue in case nos. 17 and 23 (PA#1406256, PA#1604384). The concern in the latter case was that the minimal notation "stress test +" did not make clear whether appellant had reviewed the results of the stress test, viewed the test itself, or discussed it with the radiologist. In case no. 18 (PA#1432125), even appellant's expert conceded a catheterization on a patient with chest pain of pulmonary origin was "a slightly aggressive diagnostic approach."

27

Appellant is correct that in case no. 20 (PA#1266829), respondent's expert retreated from his original opinion that the catheterization was not justified in light of evidence in the medical record of continuing complaints of chest pain, and stated appellant could have elected to do it under the relevant guidelines. But in case no. 13 (PA#1680234), the expert explained he did not consider a nurse's note "C-P still on Ntg" to be an adequate record of continuing chest pain two days after admission because "[i]t would be unusual to be on nitroglycerine drip for that period of time," and the need for it should have been noted in the progress report. The expert considered catheterization to be unjustified based on the patient's recorded condition, even though the relevant guidelines may have allowed it, because the tests did not show an acute exacerbation of the patient's cardiac disease. Similarly, in case no. 21 (PA#1463446), the expert opined that catheterization of a patient hospitalized with abdominal pain, hypertension and end-stage renal disease was unjustified because her EKG was unremarkable, and the rest of the medical record did not corroborate appellant's report that she complained of mild chest pain. The expert explained his reasoning, and we cannot say that his opinion has no evidentiary value, especially considering the repeated presence of vague, uncorroborated statements of chest pain in several of appellant's catheterization cases. In another such case, case no. 11 (PA#1058363, PA#1174789), the medical record lacked detail about the patient's reported ischemic heart disease and positive outpatient stress test, and did not support the statement in the discharge summary that the patient had been admitted for chest pain.

Additional documentation problems were identified in many cases. In case no. 3 (PA#1418769), there was a discrepancy between a post-catheterization progress note stating, "No complications. Full report to follow," and the actual report, which revealed the patient had gone into a complete heart block during the procedure. Although appellant was incorrectly charged with a problematic diagnosis of congestive heart failure and reading of an echocardiogram as showing severe aortic stenosis in case no. 5 (PA#528994), both of which were done by another doctor, appellant contributed to the problem by relying on them, despite the absence of supporting data and clinical findings.

28

Appellant failed to document the results of an important echocardiogram in case no. 14 (PA#919683), and in case no. 15 (PA#1477170), he incorrectly documented that a stress test revealed a new, rather than existing defect, making the patient's condition appear more severe than it was.

Appellant testified that catheterization on the patient in case no. 19 (PA#1409840) was justified because the patient had unstable angina, and the angiogram was abnormal for the same reason. Other than a brief mention of a history of ischemic heart disease and angina, the medical record apparently included no documentation of appellant's conclusion that the patient had unstable angina. In case no. 22 (PA#1156870), catheterization was performed on a patient with a history of heart disease and coronary bypass grafting. The medical record included a notation of a "recent angiogram which showed blocked arteries." Respondent's expert faulted appellant for not obtaining the results of the angiogram and documenting them before deciding to proceed with another one. Appellant testified he did not think the patient had undergone catheterization recently, contrary to the notation in the record.

In a number of these cases, there was expert testimony that appellant's documentation or care was substandard. One of respondent's experts explained that performing catheterization without adequate indication exposes the patient to unnecessary physical and mental discomfort, increased costs, and risk of complications, such as bleeding, infection, arrhythmia and others. In his testimony at the hearing, appellant often went beyond the medical records to justify his unrecorded actions, reasoning, and conclusions, or to harmonize conflicts in the evidence. The JRC was not required to accept his testimony, and under the substantial evidence standard of review, we must resolve conflicts and draw inferences in favor of respondent's decision. (*Huang v. Board of Directors*, *supra*, 220 Cal.App.3d at p. 1294.) The weight of the evidence supports the JRC's findings that appellant often failed to investigate discrepancies between test results, clinical findings, and the patients' condition, and to adequately document them, thus potentially affecting the continuity of patient care and exposing

29

patients to the unnecessary risk of undergoing invasive tests not clearly indicated by the medical record.

Also alleged under charge I was one incident of unprofessional conduct. During a stress test, appellant made disparaging comments about two technicians present at the test. Despite their protestations, appellant claimed one technician had not shown the patient how to walk on the treadmill and the other had no idea if the IV was in or out. He ordered the first technician to help the patient get off and then back onto the treadmill while it was still elevated and moving, exposing both to unnecessary risk of injury. Appellant argues the JRC must not have considered this incident because it did not refer to it specifically. But the JRC did refer to appellant's unprofessional conduct toward staff, of which this incident was an example.

Appellant also argues that since neither technician testified at the hearing, he had no opportunity to cross-examine them, and their hearsay written statements about the incident are not substantial evidence. Section 809.3, subdivision (a)(4), allows the parties to a peer review proceeding to present evidence "determined by the arbitrator or presiding officer to be relevant." Under the Bylaws (art. VIII, § C(11)(f)), relevant hearsay evidence is admissible at a peer review hearing, so long as it is the type of evidence upon which "responsible persons are accustomed to rely in the conduct of serious affairs." The evidence came in through the testimony of the catheterization laboratory's director, who investigated both appellant's complaints about the laboratory and staff complaints about appellant. The hearing officer ruled the director's testimony about complaints he received and investigated was the type of hearsay evidence on which one would reasonably rely. We see no problem in that ruling. Appellant had no constitutional right to confront witnesses since a hospital peer review proceeding is not criminal in nature. (See *Medical Staff of Sharp Memorial Hospital v. Superior Court* (2004) 121 Cal.App.4th 173, 182.)

The incident supports the JRC's finding that in addition to substandard care and documentation, appellant's unprofessional relationship with staff was disruptive of patient care.

30

### B. *Pattern of Inadequate, Substandard Medical Record Documentation*

Charge III stated that appellant engaged in "a pattern of inadequate, substandard medical record documentation." This charge included allegations that his documentation was "meager, boilerplate, and written in a scrawl." His notes did not reflect "patient-specific findings, the course of treatment, or [his] thought process with regard to the resolution of the patient's clinical problem. Frequent discrepancies are noted, crucial data is omitted, history and physicals are grossly inadequate and incomplete, and progress notes do not effectively track the patient's hospital course." This allegedly resulted in "poor continuity of patient care and inability of other healthcare professionals to adequately treat the patient, thus exposing patients to unnecessary risk of harm." The charge was illustrated with 22 medical records (four were listed twice), as well as the NMA and Hirsch reports.

The JRC noted that "the patent's status in the Hospital concerning studies, consultations, and progress must be recorded in a timely, concise, and readable manner." It found appellant's penmanship to be "totally illegible"; his workups boilerplate and lacking the expected variety "given his specialty and patient base." His records did not "reflect patient-specific indications for the course of treatment or his thought process with regard to the resolution of the patient's clinical problem."

Two-thirds of the medical records listed in support of charge III also were at issue in charge I, which referenced charge III. In light of this substantial overlap of the two charges, the JRC, in effect, considered them both cumulatively and separately. We have noted the various documentation problems identified in these cases in our discussion of charge I.

Respondent's experts additionally testified that appellant's history and physical information sheets often provided insufficient description of the patient's present illness or complaints and prior history. According to their testimony, the patient's progress was insufficiently recorded in the progress notes, the charts provided insufficient documentation of appellant's reasoning and his diagnostic approach, and discharge summaries did not include directions for follow-up. The experts explained that

31

inadequate medical record documentation could result in missing important aspects of a patient's condition, and in poor continuity of care if more than one physician was involved in a case. That is so because physicians rely on the patients' medical records, rather than face-to-face communication, to get relevant information.

Appellant broadly argues that respondent's reviewers and experts misstate the record in many cases. This argument is supported by selective, somewhat random, and often conclusory or inadequately documented statements directed at the NMA and Hirsch audit reports rather than at the expert testimony at the JRC hearing. Our review of the record indicates that, with the exception of case nos. 5, 13, and 20, where an expert conceded there was either no documentation error or the error was that of another doctor, appellant's criticism falls short of undermining the foundation of the expert opinions supporting this charge.

We address briefly appellant's various claims of error. In case no. 8, appellant was not criticized for failing to provide "a history and physical," as he claims, but for not including a history of the present illness in the history and physical. Respondent's expert made clear at the hearing that the discrepancy in gradients in case no. 9 was "gross," rather than the commonly occurring minor discrepancy appellant suggests it was. In case no. 12, the outside reviewer questioned appellant's documentation of chest pain because it was contradicted by the lack of complaints of chest pain on admission. In case no. 14, appellant was not criticized solely for the poor organization of his history and physical information, as he suggests, and at the hearing, his own expert agreed that the cardiac workup in the case was incomplete.

One outside reviewer took issue with appellant's indications for catheterization: "to get information that might help in prognosis and treatment" and "to get information about myocardial ischemia." At the hearing, the reviewer explained that these were general goals rather than true individualized indications. Appellant argues that this critique is immaterial in case nos. 15 and 16, where the reviewer found the catheterization was indicated by the medical record. But by the same token, the critique is material in cases where the reviewer found that catheterization was not indicated.

32

In case no. 18, appellant's description of the patient's chest pain as cardiac in nature was suspect because the pain had already been diagnosed as pleuritic in a pulmonary consult with which appellant had agreed; in light of that, appellant could not reasonably have adopted the emergency room physician's tentative initial angina diagnosis, on which he now relies.

The reviewer in case no. 23 clarified at the hearing that he did not criticize appellant for not documenting the result of a stress test, but that the scant notation "stress test +" gave no indication appellant had reviewed the actual test report. In case no. 25 (PA#3579257), the reviewer's tentativeness about the precise date of a prior angiography does not undermine his opinion that appellant should have documented its results. Nor does one reviewer's failure to notice the problem undercut another reviewer's opinion that, in case no. 30, appellant's "telegraphic, meager" progress notes "written in scrawl" do not give a clear picture of the patient's course of treatment in the hospital.

Appellant's citations to the record do not support the conclusory claim that he adequately documented prior revascularizations in case nos. 24 (PA#978280) and 27 (PA#917931, PA#90646). Appellant may be correct that, in case no. 31 (PA#1871285), a reviewer erroneously assumed the patient, who suffered a recurrent transient ischemic attack, had been admitted before, and in case no. 32 (PA#1083040), the presumed lack of documentation of the patient's asthma and infection was based on the reviewer's conflation of two patients' medical records. But these errors do not impact the reviewers' criticism of appellant's inadequate justification of the diagnosis of coronary artery disease in case no. 31 and documentation of the patient's cardiovascular condition and tests in case no. 32, which appellant does not address.

Since charges I and III are substantially coextensive, the JRC's findings on charge III are supported by substantial evidence for the same reasons as the findings on charge I. While the range of documentation problems is indeed broad, appellant's characterization that they are generally trivial is contradicted by the opinion of respondent's experts, which is sufficient to support the JRC's decision.

33

## C. Inappropriate Interpersonal Relations

Charge V stated that appellant "engaged in a pattern of inappropriate interpersonal relations with staff members, patients and their families" in violation of the bylaws, ethics, and professional standards, to the detriment of overall hospital function and the quality of patient care. The charge referenced a list of incidents, medical records, and the outside audit reports. The JRC sustained the charge in part, finding a pattern of inappropriate interpersonal relations with staff members, but not with patients and their families. The JRC found appellant's behavior was similar to behavior about which he had been "warned," and that this repetitive inappropriate behavior was "below the accepted standard of behavior for physicians."

Appellant argues the JRC inappropriately relied on charges filed against him in 1997, which were not sustained since the matter was settled. We do not read the JRC's decision as improperly basing the finding under charge V on the prior case against appellant since the JRC expressly refused to sustain charge VI, which was a summary of that case. Nor do we understand the JRC to mean that appellant received a formal warning as discipline in the prior case. To the extent the JRC's finding may be read to mean that the prior charges gave appellant notice of the behavior that could expose him to disciplinary action, we do not consider that finding necessary to the decision. The allegations against appellant in this case were sufficient to support a finding of repetitive unprofessional conduct, without need to reference the prior case.

Respondent's witnesses testified that appellant was contentious and inflexible, regardless of whether he was right or wrong, and often lost his temper and used foul language in front of staff and patients. The director of the cardiac catheterization laboratory and the director of clinical process improvement at the hospital both testified they had personally observed appellant's inappropriate behavior with laboratory technicians, nurses, nursing supervisors, and case managers. They also had received and investigated complaints from staff. The laboratory director testified generally that his staff found working with appellant to be difficult. The laboratory director also explained that when appellant became angry, it was impossible to talk to him and resolve issues

34

because appellant never acknowledged that he had done anything wrong, and he appeared to enjoy arguing. Similarly, respondent's chief executive officer testified that when, in 2002, he spoke to appellant about lashing out at staff, appellant responded he enjoyed "causing trouble, it makes it fun."

Between 2000 and 2002, appellant was virtually the only physician who complained about stress test scheduling at the catheterization laboratory. He would get extremely upset over scheduling problems even though his own special demands and limited availability contributed to the problems. He accused the staff of the catheterization laboratory of favoring another physician over him in scheduling stress tests, but an investigation proved the complaint to be unfounded. He was rude and argumentative even when staff attempted to resolve scheduling and other problems. Once, appellant stopped a stress test because he believed the I.V. tubing did not correctly deliver the medicine to the patient. He insisted the hospital customize the tubing, and the hospital eventually bought the tubing appellant requested. But, in the meantime, appellant used offensive language in a special meeting with a representative of the tubing manufacturer, convened to show him how the tubing worked.

A recurrent issue was appellant's inappropriate documentation of his complaints about patient care in the patients' medical records. Respondent's witnesses, and even appellant's experts, agreed that while appellant should be free to advocate for patient care, his approach was improper and ineffective because it created legal liability issues for himself and respondent without resolving the problems. The director of clinical process improvement testified that the proper way to communicate with case managers was to use a "yellow sheet," which was detachable from the patient's record and became part of the risk management files. Appellant repeatedly had been told not to use the medical records to communicate his frustrations and problems with administration.

For instance, in case no. 3, appellant complained that a direct admit patient had stayed in the emergency room for 10 hours. Respondent's expert testified that this issue should be dealt with internally and interpersonally rather than in the patient's medical record. In case no. 34 (PA#1068180), appellant issued repeated physician's orders for

35

the transfer of a patient and complained of the delay in transfer. The director of clinical process improvement testified that appellant's repeated orders did not acknowledge that the hospital was working to obtain a transfer. His contentious relationship with case managers, in fact, slowed down the process and opened the hospital to liability. In case nos. 24 and 30, appellant complained at length about the denial of Medi-Cal coverage, when even his expert agreed one sentence would have been sufficient, and the complaint about the denial of coverage was not properly addressed to the hospital's administration.

Appellant argues that he cannot be disciplined for advocating for patient care. We agree, but that is not the issue here. Under section 2056, subdivision (c), the termination or penalization of a "'physician and surgeon principally for advocating for medically appropriate health care . . . violates the public policy of this state.'" (*Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 47.) Even assuming that patient care advocacy was involved in most incidents alleged under charge V, this was not the only sustained charge against appellant, and there is no indication that the other sustained charges were pretextual. Thus, it cannot be said that appellant was denied reappointment *principally* because he advocated for patient care. Additionally, even as to charge V, appellant was for the most part not faulted for his complaints but for the manner in which he made them. At least in some instances, his contentiousness did not appear motivated solely by a desire to advocate for patient care and resulted in obstructionism.

Appellant's reliance on *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614 fails for the same reason. The court in that case held that a physician's staff privileges may not be terminated solely based on his inability to work with others unless his behavior presents "a real and substantial danger that patients treated by him might receive other than a 'high quality of medical care' at the facility . . . ." (*Id.* at p. 629.) As we have explained, appellant was not denied reappointment *solely* because he could not work with others. Furthermore, testimony that, when angry, appellant made it difficult or impossible to resolve issues of patient care and that the manner of his advocacy was ineffective or even counterproductive provided a demonstrable nexus between his

contentious relationship with staff and the quality of patient care.  (See *Marmion v. Mercy Hospital & Medical Center* (1983) 145 Cal.App.3d 72, 86 [finding specific instances of inability to work with others oriented toward patient care sufficient to justify termination from residency training program].)

We conclude that the JRC's findings on the sustained charges are supported by substantial evidence.

### D. Penalty

In the reply brief, appellant argues the JRC's statement that "it would have pursued an intermediate resolution" had it been the initial decision maker renders its decision ambiguous because it suggests the JRC disagreed with the Governing Board's decision to deny reappointment, but nevertheless deferred to that decision.  We need not address this untimely argument, but, in any event, there is no ambiguity.  The JRC applied the correct standard of review when it concluded by a preponderance of the evidence that the decision of the Governing Board to deny appellant reappointment "was reasonable and warranted."  Its statement does not indicate it would have upheld the decision had it been unreasonable or unwarranted.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.                              MANELLA, J.

37